## COUNTY OF WINDSOR,

### AT THE

### FEBRUARY TERM, 1859.

---

PRESENT:

Hon. MILO L. BENNETT, ⎫
Hon. LUKE P. POLAND, ⎬ Assistant Judges.
Hon. JOHN PIERPOINT, ⎪
Hon. JAMES BARRETT, ⎭

---

### SOLOMON DOWNER *v.* EBENEZER SMITH.

*Rescision of Contracts. Fraud.*

Where one has the right to rescind a contract and exercises that right, he must generally restore the other party to the same condition he would have been in, if no contract had been made.

But when one rescinds a contract on the ground of fraud, he is only bound to do so with all reasonable dispatch, after he discovers the fraud, and he does not lose his right to rescind, because at that time the contract has been in part executed, and the parties cannot for that reason be fully restored to their former position.

But if, after discovering the fraud, he continues to act under the contract, his right of rescision is thereby waived.

2

Downer *v.* Smith.

When notes are given for the purchase of property, which the purchaser has the right to rescind on account of fraud, but neglects to do so, and continues to act under the contract after he discovers the fraud, he will not be permitted to defend an action upon the notes on the ground of the fraud.

ASSUMPSIT upon a promissory note, signed by the defendant and one Safford, dated May 8, 1856, for two thousand dollars, payable to Warren C. French, or bearer, in sixteen months from date, with interest annually. Plea, the general issue, and trial by jury at the December Term, 1858,—REDFIELD, CH. J. presiding.

The execution of the note was admitted, but the defendant claimed that it was obtained by the fraudulent representations of the plaintiff, at the time it was given, he being the party in interest.

The testimony of the defendant tended to prove that the note in suit, with other notes, was given by the defendant and one Safford (since deceased) for some mortgage interests which the plaintiff held on certain lands in the towns of Braintree, Granville, and Roxbury, and that at the date of the note, the plaintiff held a mortgage on the Benjamin Spear farm, lying in Braintree and Granville, executed by Albert Hawes to Daniel Tarbell, Jr., and by Tarbell assigned to the plaintiff; also, a mortgage on the Ephraim Thayer farm, lying in Braintree and Granville, given by Tarbell to Thayer, and by Thayer assigned to the plaintiff, to secure the payment of a note of about fifteen hundred dollars, executed by Tarbell; also, a mortgage on the Bliss farm, lying in Granville, and on lands in Roxbury, executed by Tarbell to the plaintiff to secure him for endorsing a draft for Tarbell for about twenty-four hundred dollars, upon Hatch & Taisey, and also for any debts that Tarbell might then be owing him; that as part of the transaction, and in pursuance of the arrangement previously made, the plaintiff executed to the defendant and Safford an assignment of the Hawes mortgage, and three notes of one thousand dollars each, executed by Hawes and secured thereby; an assignment of Tarbell's mortgage on the Bliss farm and the Roxbury lands, for securing the Hatch & Taisey draft, and a discharge of this mortgage for all other purposes; also, an assignment of Tarbell's mortgage to Thayer, and a quit claim deed to

Downer *v.* Smith.

the defendant and Safford, of all the plaintiff's interest in all the lands in said towns acquired of Tarbell; that on the twelfth of May, 1856, the defendant and Safford, in pursuance of the arrangement before entered into, executed to the plaintiff a note of about six hundred and twenty dollars, and a bond, to indemnify the plaintiff against the Hatch & Taisey draft, and three promissory notes, of two thousand dollars each, one payable in eight months, one in sixteen months,—the note in suit;—and the other in twenty-four months from date; that previous to the execution of such bond and notes, and also, at the time of their execution and the negotiation of the contract for the transfer of the mortgages, the plaintiff was particularly inquired of by the defendant and Safford, whether there were any other incumbrances on any of the premises; that the defendant then informed the plaintiff that they had no time to go to the different town clerks' offices to examine the records, and that the defendant and Safford should rely upon the statements and representations of the plaintiff in regard to the titles, and that the plaintiff, on various occasions, previous to and at the time of the trade, when inquired of, distinctly represented to and assured the defendant and Safford, that he had been careful to make the examination of the records, and that there was no incumbrance upon the premises prior to his own mortgages, excepting one mortgage executed by Tarbell to the South Royalton Bank, and assigned by the Bank to the State Treasurer, for banking purposes.

The defendant's testimony tended also to prove, that this arrangement was not for the benefit of himself and Safford personally; that they were directors of the South Royalton Bank, to which Tarbell was deeply indebted; that the bank had a general mortgage on all the lands of Tarbell in the towns above mentioned, as security for any indebtedness of his to the bank, which was executed subsequently to the plaintiff's mortgages; that while the general mortgage of the plaintiff existed, the bank could not calculate the value of their own general mortgage, that the plaintiff and Tarbell were in a quarrel, and Tarbell retained the possession from the plaintiff, so that nothing was likely to be realized from the avails of the property for paying off the mortgages of the plaintiff; that in view of this they

entered into the contract for the benefit of the bank, expecting that the proceeds of the lands and mills, and personal property hereafter mentioned, would be applied, and be sufficient, ultimately, to pay off the notes and bond they had given to the plaintiff, and thus leave the general mortgage of Tarbell to the bank free from the plaintiff's mortgages, and thus secure something of Tarbell's indebtedness to the bank; that the plaintiff was interested in the affairs of the bank to a considerable extent, and was aware of the objects of the arrangement, and those objects were talked over by the plaintiff, defendant, and Safford; that one other object of Smith and Safford in entering into this arrangement, was, that after obtaining a discharge of the plaintiff's mortgages, they were to release, specially, to the bank, their interests, thus acquired, to enable the bank to obtain a further issue of bills from the treasurer, on the re-appraisal of said farms and lands, which had already been made, and a new mortgage had been executed by Tarbell on said farms for that purpose; that the amount which would accrue therefrom would be near three thousand seven hundred and fifty dollars, and it was agreed between the bank, defendant, Safford, and Tarbell, that if the business was thus completed, the money received on such re-appraisal was to come directly into the hands of the defendant and Safford, for the purpose of paying their notes and obligations to the plaintiff, and that the bank were to take security of Tarbell therefor; and that all this was well known to the plaintiff at the time of the trade.

As a further inducement for entering into the business, it was represented to the defendant and Safford, that there was a large amount of personal property on the premises, oxen, sleds, horses and harnesses, and a large amount of lumber and wood fitted and prepared for market, and more in the mills ready to be manufactured, and Campbell, the lessee of the premises, was to transfer to them his rights therein, and that Campbell executed in writing a transfer of all his interest in the premises and personal property, which was known to Downer, and witnessed by him at the time of its execution, and thus the defendant and Safford would have from the avails of such personal property additional means to enable them to meet and pay off to the plaintiff the

debts thus assumed for Tarbell; that when the defendant went to take possession of the premises and personal property, he found that the plaintiff, on the 12th, 13th or 14th of May, 1856, had attached the wood, lumber and hay, on debts against Tarbell, and had left copies of his writs in the town clerks' offices.

The defendant's testimony further tended to prove, that at the time the defendant gave said notes and bond to the plaintiff, Benjamin Spear held a mortgage on the Spear farm, executed by Tarbell to him, amounting to about eighteen hundred dollars, which was then outstanding and unpaid, and that Daniel Bliss also held a mortgage on the Bliss farm, given him by Tarbell, amounting to near two thousand dollars, also then outstanding and unpaid, and that these mortgages were known to the plaintiff at the time of the trade; that the defendant and Safford knew nothing of these mortgages at the time of the contract, but relied wholly upon the plaintiff's representations and assurances that the premises were free and clear of all incumbrances, except the first mortgage to the bank for the redemption of bills, as before stated; and that neither the plaintiff nor Safford would have taken such assignments and transfers, nor have given their notes and obligations to the plaintiff if they had been informed of the Spear and Bliss mortgages; that the defendant and Safford had no object to own the real estate, but had an interest to enable the bank to make their security good, and have the quarrel between Tarbell and the plaintiff stopped, and did not anticipate any profit, except the advantage to the bank, and that this was the object of the whole transaction, which was all explained to the plaintiff at the time; and that the first they knew of these incumbrances, was upon the return of the agent of the Treasurer, who refused to give certificates as to the titles, except upon the Roxbury lands, upon which the bank received about thirteen hundred dollars, and for which they gave the defendant and Safford a certificate of deposit.

The defendant's testimony tended further to prove, that the defendant and Safford received for sales of the personal property, twelve hundred and thirty-six dollars, and expended in various ways thirty-one hundred and twenty-five dollars, and some bills of which the defendant kept no account; that the defendant

and Safford abandoned the premises some time after November 8th, 1856, and had the ostensible control of the premises up to that time; that Downer did not sell or interfere with any of the personal property on his attachments; that at the time of the trade, Downer took a note of Tarbell for five thousand dollars, for demands given up to Tarbell at that time, and Tarbell gave Downer bank stock to that amount as collateral security; that the second note, of two thousand dollars, due in eight months, was exchanged with Downer by the defendant and Safford, in April, 1857, and two notes were executed to the Lebanon Bank for it, for Downer's convenience; that the defendant and Safford were embarrassed in making sales of the personal property on account of Downer's attachments, and that for that reason some of the wood lay in piles, till it became depreciated in value; that in less than two months from the time of the trade, the defendant informed the plaintiff that he had deceived the defendant and Safford, in regard to the transfers they received of him, and that he did not suppose they could ever pay their notes to him, and that they had nothing to pay with; that the plaintiff several times called upon the defendant and Safford to pay their notes, and that they refused to do so ; that within a month from the time of the trade, and since that time, the defendant and Safford offered to pay the six hundred and twenty dollar note, which had been transferred to the Orange County Bank by the plaintiff, and give up all they had received of the plaintiff, and surrender the possession to him ; that in the summer of 1856, the defendant told the plaintiff that his claim against the defendant and Safford was fraudulently obtained, but that they would be glad to settle almost any way rather than go to law, and would transfer all rights they had in the property, and give up the certificate of deposit in the South Royalton Bank; and at the time of the exchange of notes before mentioned, the defendant and Safford urged plaintiff to give up their notes, and they would give up said certificate of deposit to him, and restore to him all the mortgages and all the interest they had in them, which the plaintiff declined to do; that upon the day of the date of the note in suit the defendant paid two hundred dollars on the small note of six hundred and twenty dollars, and at its maturity he paid the

balance to the Orange County Bank, and that the release before mentioned by the defendant and Safford to the South Royalton Bank was executed by them. It further appeared that the defendant had disposed of the fifteen hundred dollar mortgage on the Thayer farm for his own benefit.

There was no further testimony in the case on the part of the plaintiff.

The court instructed the jury that these facts did not constitute a defence to the note in suit, and directed a verdict for the plaintiff, to which decision and direction the defendant excepted.

*C. M. Lamb* and *Washburn & Marsh* for the defendant.

*A. P. Hunton* and *W. C. French* for the plaintiff.

BENNETT, J. This action is defended upon the ground that the note was obtained by the fraud of the plaintiff, he being at the time the note was given, the real owner thereof.

This note, with others, seems to have been given by this defendant and one Cyrus Safford for some mortgage interests, which the plaintiff held on lands in Braintree, Granville, and Roxbury; being a large amount of mortgages, and other things, not necessary now to specify particularly.

It is not controverted on this trial, but that the plaintiff was guilty of false representations in respect to the title of the lands conveyed to the defendant, and that he at the time knew them to be false, and that the defendant at the time of the trade supposed the representations to be true, and relied upon them.

The important question in this case is, whether there has been such a repudiation or rescinding of the contract on the part of the defendant, as to enable him successfully to defend against this action.

It is a common principle, that when one has a right to rescind a contract, and exercises that right, he must restore the other party to the same condition that he would have been in if no contract had been made ; but a *defrauded party* does not lose his right to rescind because the contract has been in part executed, and the parties cannot be fully restored to their former position,

but he must rescind as soon as the circumstances will permit; and he cannot go on with the contract after the fraud has been discovered, so as to prejudice the fraudulent party by the rescision being delayed. In other words, if a party rescinds, he must do it with all reasonable dispatch, upon discovering the fraud. How then are the facts in this case as applied to these principles?

We do not think the release by the plaintiff of his attachment against Tarbell can prejudice the defendant's right to rescind.

This release was a part of the contract, and it was a voluntary act on the part of the plaintiff, he at the time having full knowledge of his own fraud. The attachment created but an *inchoate* right, and by its release nothing passed to the present defendant which he can restore; and I apprehend the same may be said as to the release by the plaintiff of a portion of the Bliss farm mortgage. If there was nothing further in this case, we should find no difficulty in opening the case. But we have already said, that if a party rescinds on the ground of fraud, he must do it at once on discovering the fraud; but he is not bound to rescind; and if he still continues to act under the contract, it will be regarded as an election of his right, and a waiver of the right to rescind. In *Silway* v. *Fogg*, 5 M. & S. 83, there was a contract to remove certain rubbish for a *specified sum*, and it was found by the person who took the job upon commencing the work, that he had been deceived by false representations as to the quantity of the rubbish; but still he went on and removed it and then sought by reason of the fraud to recover more than the contract price; but it was held, that by his simply going on, he had waived all right to rescind and could only recover the price agreed to be paid. See also *Saratoga R. R. Co.* v. *Row*, 24 Wend. 74.

It is to be taken that the defendant was made aware of the fraud very soon after the contract was closed; but he did not then repudiate the contract and restore the property which he had gained by the contract, but held and used it as under his contract. The defendant was made aware of the prior mortgages on the property in two or three days after the trade, and this fact constituted the representation fraudulent; and yet the defendant went on and put it out of his power to restore to Downer what was still within his contract. He discharged mortgages, and

created a new mortgage to the State Treasurer of thirteen hundred dollars, and took a certificate of deposit for that amount, and took possession of the personal property, and subsequently disposed of it, and he also assigned away for his own benefit the fifteen hundred dollar mortgage; and the first two thousand dollar note given under this contract, which matured at the end of eight months, was taken up.

We think, without going further into the facts, the testimony was ample to show an affirmance of the contract by the defendant after the discovery of the fraud; and it is well settled, that if after the discovery of the fraud, the party elects to go on under the contract, that is an affirmance of it, and concludes him from subsequently rescinding it.

We see no good and sufficient reason why this case must not be governed by those rules which are ordinarily applicable to the rescision of contracts.

If no part of the notes had been paid to. Downer, the defence, if good for one note, would have been good for all.

It is altogether impracticable to settle the rights of the parties in this case, as the facts now stand, in actions upon the notes by any known principles of the law.

Judgment affirmed.