JOSIAH GREENWOOD

*v.*

THOMAS E. FENN *et al.*

*Filed at Ottawa January 22, 1891.*

1. RESCISSION OF CONTRACT—*for fraud—not relying upon the alleged fraudulent representations.* If a complainant seeking a rescission of an executed contract for the exchange of properties, makes the exchange relying upon his own judgment, based on a personal inspection of the land for which he makes the exchange, and not upon representations made to him by the defendant, he can not be heard to complain that a fraud was practiced upon him, even though it shall appear that the examination made by him was in fact inadequate, so as to lead to mistaken conclusions.

2. SAME—*rescission for fraud—promptness required in making election—after discovery of the fraud.* If a party is induced to make an exchange of properties, by the false and fraudulent representations of the defendant, the transaction will not be void, but only voidable, at his election ; and if he wishes to rescind the trade, he must make his election to do so promptly after becoming aware of the fraud. If he continues to treat the land which he has received in exchange, as his own, and proceeds to make valuable improvements thereon, and avails himself of the uses and profits thereof after becoming fully apprised of the facts, he will be held to have elected to affirm the transaction, and he can not afterward rescind.

3. So where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract as if the mistake or fraud had not occurred. Delay and vacillation are fatal to the right to rescind.

4. The party seeking to rescind must do so promptly on discovering that he has been defrauded by false representations as to the character and quality of the property bought by him. He can not lie by until he discovers the full extent of the fraud practiced on him. A further discovery of fraud will not give him a further election to rescind.

5. CHANCERY—*presumption—in support of finding below.* Where a cause in chancery has been heard upon the pleadings and proofs, and the bill dismissed for want of equity, it will be presumed, in support of the decree, that the contested questions of fact were resolved in favor of the defendant.

6. Where the testimony of the parties and witnesses, on the hearing of a contested chancery suit, is given orally in court, the chancellor will have a better opportunity than this court to judge of their relative credibility, from seeing and hearing them while testifying.

APPEAL from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

Mr. E. A. SHERBURNE, for the appellant:

To entitle complainant to recover it is not necessary that he should have relied solely on the false representations. If he was influenced thereby, though he relied, in part, on other information, he can recover. Benjamin on Sales, (4th Am. ed.) secs. 429, 453; 2 Pomeroy's Eq. Jur. sec. 890, p. 375; *Redgrave* v. *Hurd,* 20 L. R. Ch. Div. 1 ; *Thorne* v. *Prentiss,* 83 Ill.

99; *Ruff* v. *Jarrett*, 94 id. 479; *Morgan* v. *Skidely*, 62 N. Y. 329; *Shaw* v. *Stine*, 8 Bosw. 157; *Nichols' case*, 3 DeG., M. & G. 719; *Daniel* v. *Mitchell*, 1 Story, 172; *Doggett* v. *Emerson*, 3 id. 700; *Hough* v. *Richardson*, id. 690; *Smith* v. *Richards*, 13 Pet. 26.

The presumption is that the representations were relied on. Kerr on Fraud and Mistake, 75; *Redgrave* v. *Hurd, supra; Nichols' case*, 3 DeG. & J. 387; *Holbrook* v. *Burt*, 23 Pick. 546; *Fishback* v. *Miller*, 15 Nev. 428; Benjamin on Sales, (4th Am. ed.) sec. 429, note b, and sec. 453.

But the representations need not have been the sole inducement. It is enough if they had material influence upon the plaintiff, though combined with other motives. *Matthews* v. *Bliss*, 22 Pick. 48; *Safford* v. *Grant*, 120 Mass. 20; *Ruff* v. *Jarrett*, 94 Ill. 475; *McAleer* v. *Horsey*, 35 Md. 430; *Hersey* v. *Benedict*, 15 Hun, 282; *People* v. *Haynes*, 11 Wend. 557; *Winter* v. *Brandell*, 30 Ark. 363.

Complainant was not guilty of *laches.* His offer to rescind was within a reasonable time after the fraud was discovered. *Hopkins* v. *Snedaker*, 71 Ill. 449; *Whitcomb* v. *Denio*, 52 Vt. 382; *Dayton* v. *Monroe*, 42 Mich. 193; *Clough* v. *Railway Co.* L. R. 7 Ex. 26.

Credulity of complainant can not be set up by defendants to avoid a rescission. *Kendall* v. *Wilson*, 41 Vt. 567; *Allen* v. *Hart*, 72 Ill. 104; *Pierce* v. *Wilson*, 34 Ala. 603.

Mr. E. A. OTIS, and Mr. EDWARD MAHER, for the appellees:

Ordinarily, statements of an indefinite or general character, made by either of the parties pending a negotiation for the sale of property, relating to its cost or value, or offers made for it, and the like, will not, in the absence of special circumstances, afford any ground for avoiding the sale, although false, and made with a fraudulent intent. *Dillman* v. *Nadelhoffer*, 119 Ill. 575, and cases there cited; *Tuck* v. *Downing*, 76 id. 71.

As to the character of false representations which will authorize a rescission for fraud, see *Walker* v. *Hough,* 59 Ill. 375; *Young* v. *Young,* 113 id. 430; *Noetling* v. *Wright,* 72 id. 390; *Miller* v. *Craig,* 36 id. 111; *Van Horn* v. *Keenan,* 28 id. 448; *Fauntleroy* v. *Wilcox,* 80 id. 477; *Schramm* v. *O'Connor,* 98 id. 539.

If the appellant ever, at any time, had any right to rescind the contract, it was lost by acts of confirmation, acquiescence and *laches* on his part. Benjamin on Sales, par. 675; *Grymes* v. *Sanders,* 93 U. S. 55; *Campbell* v. *Flemming,* 1 A. & E. 40; 2 Pomeroy's Eq. Jur. sec. 897; *Schiffer* v. *Deitz,* 83 N. Y. 300; *Vigers* v. *Pike,* 8 Cl. & Fin. 562; *Parsons* v. *Hughes,* 9 Paige, 591; *Bassett* v. *Brown,* 105 Mass. 551.

If the purchaser would rescind, he must return the consideration he may have received in exchange, or at least signify his election within a reasonable time, otherwise his silence, after knowledge of the facts which entitle him to disaffirm, will be construed as an election to affirm, or an affirmance by acquiescence. Chitty on Contracts, (10th Am. ed.) 489, 815; *Kimball* v. *Cunningham,* 4 Mass. 502; *Copeland* v. *Insurance Co.* 6 Pick. 198; *Perley* v. *Balch,* 23 id. 283; *Towers* v. *Barrett,* 1 T. R. 136; *Norton* v. *Young,* 3 Greenlf. 30.

If, after such knowledge, he continues to deal with the property received as his own, he thereby affirms the contract by which he received it. 2 Kent's Com. (6th ed.) 613; Story on Sales, secs. 420, 446; *Leonard* v. *Morgan,* 6 Gray, 412; *Hoffman* v. *Noble,* 6 Metc. 68; *Campbell* v. *Flemming,* 1 A. & E. 40; *Whitney* v. *Allaire,* 4 Denio, 554.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Josiah Greenwood against Thomas E. Fenn and Sarah T. Slayton and Nettie H. Slayton, the heirs and devisees of Charles A. Slayton, deceased, to rescind a contract in pursuance of which the complainant had conveyed certain lots and buildings in the city

of Chicago to said Thomas E. Fenn and Charles A. Slayton in exchange for certain farming lands in the State of Wisconsin, and to compel a reconveyance to the complainant of said Chicago property. The bill alleges that in January, 1889, the complainant was the owner of certain lots and buildings in Chicago worth at least $30,000, and subject to an incumbrance of $10,000; that Slayton and Fenn represented to him that they were the owners of 2131.76 acres of land in Juneau county, Wisconsin; that said land "was an improved stock farm, fine grazing lands, with ample buildings, excellent water, black soil two feet deep, producing two to two and one-half tons of blue-joint hay per acre annually, producing thousands of tons of hay for which they could get $60 a car-load, was good plough land, and that they believed it to be worth $25 per acre."

The bill further alleges that the complainant had spent most of his time for twenty-five years in the city and conceived the idea that it would be pleasant and profitable to possess such a farm and reside in the quiet of the country raising stock; that said Slayton and Fenn, to induce the complainant to make said exchange, about the 1st of February, 1889, induced him to accompany them to view said lands; that at that time the ground was frozen and covered with snow to the depth of a foot or more, so that it was impossible for the complainant to see and know from observation whether said representations were true or false; that he had no knowledge or experience in relation to lands of that character, and even if it had been summer, he would not have known whether the grass growing on said lands was blue grass or not, nor could he have told anything as to the quantity it would produce per acre, although if it had been summer, he would have detected what he has since found, viz, that a large portion of said hay lands was covered with water; that he believed and acted upon said representations and was thereby induced to and did convey and deliver to said Slayton and Fenn the complainant's said

property in Chicago, subject to said incumbrance of $10,000, together with a large amount of personal property thereon of the value of about $4000, in consideration of receiving from them a conveyance of said lands in Wisconsin and their note for $2000, secured by a mortgage of said Chicago property; that on receiving said conveyance, the complainant immediately set men to work erecting buildings and fences and digging ditches on said lands, but making visits thereto of about one week's duration twice a month, and before he had discovered the real character of said lands and of the products thereof, he had expended thereon in buildings and improvements about $5000; that when summer came, he found, and now avers the fact to be, that a large part of said land is in reality a morass or marsh, much of it permanently under water and entirely worthless, and as the grass grew and the harvest approached, and he had an opportunity to acquire some practical knowledge of said lands and their products and value, he found, and now avers the fact to be, that said lands produced little or no blue-joint or any other grass fit for hay, but only rushes and weeds, and a certain grass known as wire-grass instead, all practically worthless, and he also found the soil of said hay land to be a thin layer of decayed vegetable matter lying upon a bed of sand or quick-sand, and not producing to exceed five hundred pounds of hay per acre annually, and that the other parts of said land are almost pure beds of sand covered on top with only one inch of decayed vegetable matter, and that the whole tract is almost if not quite worthless for grazing, stock-raising or any other farming purpose, and that the whole, exclusive of the improvements put thereon by the complainant, is not worth $1000.

It is further alleged that said representations made by Slayton and Fenn to the complainant were and are false, and were known by them to be false at the time they were made; that they knew and were informed that the complainant was ignorant and inexperienced in such matters, and they took advan-

tage of his ignorance and inexperience to cheat and defraud him out of his said Chicago property; that the complainant did not learn the falsity of said representations nor the true character and value of said Wisconsin lands, until after about eight months had passed and he had seen the grass and crops that grew thereon; that the crops grown on said land during that time have not equalled in value the expenses incurred in raising and gathering them; that he has never, since he be-. came aware of the true character of said lands, expressed or indicated that he was satisfied therewith, nor said or done anything to affirm or ratify said exchange; that since said exchange of property, said Slayton has died, leaving surviving him Sarah T. Slayton, his widow, and Nettie H. Slayton, his daughter, they being his only heirs at law.

The bill tenders to the defendants a reconveyance of said Wisconsin lands and all property received by him in connection therewith and the possession thereof, and to account with them for the rents and profits, and to return said note for $2000 and release the mortgage securing the same, and also to pay said $10,000 incumbrance on said Chicago property and release the defendants from all liability in relation thereto, and to do whatever else to the court should seem just and reasonable; and the bill prays that the defendants be decreed to reconvey to the complainant said Chicago property, and account for the rents and profits thereof, and that they be decreed to pay the complainant the value of the buildings and other improvements placed by him on said Wisconsin lands, and also a general prayer for relief.

The defendants answered admitting that in January, 1889, the complainant was the owner of said Chicago property, and that it was subject to an incumbrance of $10,000, maturing in November, 1889, but denying that said property was worth anything near $35,000, and denying that any such representations were made by said Slayton and Fenn to the complainant as to the character, value, products or situation of said

Wisconsin lands as are alleged in the bill, and also denying the lack of knowledge or experience in relation to such lands on the part of the complainant as is alleged in the bill, or that he acted or relied upon any representations by said Slayton and Fenn, or that any relation of trust existed between them, and alleges that no representations whatever were made by said Slayton and Fenn which were and are not strictly and literally true.

The answer further denies the allegations of the bill as to the worthless or inferior quality of said lands or the products thereof, or of the soil or the grass grown thereon, and alleges that said lands consist in part of meadow marsh, producing a good quality of grass, and in part of upland producing other crops, and that they correspond and are fully equal to all the representations made by said Slayton and Fenn at the time said exchange was made. It alleges that said exchange was consummated by the delivery of deeds about February 7, 1889 ; that Slayton and Fenn gave their note for $2000, and assumed the debt for $10,000 secured by mortgage on said Chicago property and are personally liable to the holder for its payment ; that complainant went into immediate possession of said Wisconsin lands and has ever since been and now is in possession thereof ; that said Slayton and Fenn went into immediate possession of said Chicago property and forthwith made permanent and lasting improvements thereon, and by expenditure of their money, labor and services, have largely enhanced the value thereof ; that the defendant has used and occupied said land since said sale to him, has raised crops thereon, and that with full knowledge of the nature, character, situation, products and value of said land, and with full knowledge of the improvements which the defendants had made upon said Chicago property, he has repeatedly expressed and indicated his satisfaction with his purchase thereof, and has ratified and affirmed said exchange and failed and omitted to take any action towards rescinding said sale until the filing of

the said bill, and until after, by reason of the changed condition of said properties, it was impossible that the parties should be restored to their original situation, and the defendants therefore set up and rely upon the defense of laches and negligence. The answer denies that said Wisconsin lands are worth only $1000 as alleged in the bill, or that the complainant has expended in improvements thereon to exceed $1000, and alleges that the complainant was fully notified as to the situation, nature, quality and products of said land long prior to making any improvements thereon; that the first information received by the defendants of any dissatisfaction on the part of the complainant with said sale was received about the time the mortgage on said premises for $10,000 was coming due, by the filing of the bill herein, and that said bill was filed for the obvious purpose of clouding the title to said Chicago property and preventing an extension or renewal of said mortgage. The answer admits the death of Charles A. Slayton, and that defendants Sarah T. Slayton and Nettie H. Slayton are sole devisees under his last will.

A replication to said answer was duly filed, and the cause coming on for hearing on pleadings and proofs, a decree was entered denying the relief prayed for, and dismissing the bill at the complainant's costs for want of equity. From that decree the complainant now appeals to this court.

The evidence as to the representations made to the complainant by Slayton and Fenn or either of them during the course of the negotiations which resulted in said exchange is conflicting, the complainant's testimony tending to prove said representations substantially as alleged in the bill, while that of defendant Fenn tends to show that no such representations were made, and his testimony is to some extent at least corroborated by that of witness Groves who was present at the time the complainant visited the Wisconsin lands prior to said exchange, and was also present at a subsequent interview between the parties. The court below having heard the cause on pleadings

and proofs and dismissed the bill for want of equity, and having thus, in effect, decided all controverted questions in favor of the defendants, it will be presumed, in support of the decree, that this contested question of fact was resolved in their favor. The testimony of the complainant and of defendant Fenn, as well as that of most of the other witnesses, was given orally in court, and the court having thus had an opportunity to see and hear the witnesses, was in a much better position to judge of their relative credibility than we can be with only the record of their testimony before us. If therefore the decision of the case depended solely upon whether or not the representations alleged were proved by a preponderance of the evidence, it would be very difficult for us to find tenable grounds upon which to place our dissent from the conclusion reached, as we must presume, by the court below.

There is much in the evidence warranting the conclusion that, whether said representations were made or not, the complainant exchanged his Chicago property for said Wisconsin lands upon his own judgment as to the character and qualities of said lands, and without reliance upon what Slayton and Fenn said to him about them. It is undisputed that, before making the exchange, he, in company with Slayton and Groves, went upon said lands and made such examination of them as he desired and as the circumstances permitted. It is true the lands were then covered with a considerable body of snow which naturally made the examination much more difficult and less satisfactory, but the evidence tends to show that the complainant professed, at least, to be able to form a satisfactory judgment of the character of said lands and the qualities of the soil from an examination made under those circumstances, and that he expressed himself as satisfied with the results of his examination. It can not be doubted that if he made the exchange relying upon his own judgment based upon his personal examination of the lands, and not upon representations made to him by the vendors, no fraud was practiced

upon him of which he can complain, even though it should appear that the examination made by him was in fact inadequate, so as to lead to mistaken conclusions.

But the decision of the case may be placed upon other and perhaps more satisfactory grounds. The conveyance of said lands to the complainant was made February 7, 1889, and the evidence shows, and it is in fact admitted, that he took immediate possession, and from that time up to the commencement of this suit, spent about one-half of his time each month on said lands, personally looking after his farming operations and overseeing the improvements which he was having placed on said lands. If then he was unable to examine said lands sufficiently at the time of his brief visit in the winter when the ground was covered with snow, his opportunities for finding out that he had been deceived and defrauded, if such was the case, were full and ample as soon as the snow disappeared in the spring.

The alleged defects in the character and quality of said lands, and in respect to which they failed to answer the representations alleged to have been made by the vendors, are stated quite voluminously in the bill and are illustrated in various ways by the witnesses in their testimony, but when analyzed they are all reduced to these two, first, a large portion of the surface was in reality a morass or marsh, much of it permanently covered with water, and, secondly, the soil was a thin layer of vegetable mould, in many places not more than one inch in thickness, covering a bed of sand or quick-sand. If it be admitted then that the defects in said lands were as serious as the bill alleges and the complainant's evidence tends to show, their want of productiveness which unfitted them for grazing, raising hay or other profitable tillage, was the natural, necessary and obvious result of one or both of these conditions. So far as the lands consisted of a morass or swamp or were covered with water, and so far as the soil consisted of only a film of vegetable mould an inch or so in thickness, covering a

bed of pure sand, their unproductiveness and their consequent worthlessness was apparent to any person of ordinary intelligence upon bare inspection, and the complainant had no need of waiting for the time for his crops to mature to ascertain the fact that he would inevitably be disappointed of his harvest.

The character and quality of said lands, so far as they are material here, were open to inspection as soon as the winter was gone, and it is almost inconceivable that the complainant should be personally present on said land for so large a portion of the time without being fully aware of their condition. Very soon after taking possession he commenced the erection of buildings and fences, and soon after set men to work digging ditches to drain the lakes and swamps, all of which improvements involved, to a greater or less degree, the excavation of the soil and sub-soil, and must have necessarily made the complainant, at a very early period of his occupancy, thoroughly acquainted with the inferior if not worthless character of the soil.

Although the falsity of the representations complained of must have thus early become known to the complainant, he appears to have continued in the occupancy of said lands and gone forward with his improvements, and to have pastured his cattle and cut the hay thereon, and he is not shown to have uttered any complaint to his vendors or any one else in relation to the frauds of which he now complains, until he filed his bill in this case. On the other hand he is shown to have expressed to various parties at different times down to and even after the filing of his bill, his entire satisfaction with his purchase. The date of filing the original bill does not appear from the transcript before us, that document commencing with the amended bill which appears to have been filed February 8, 1890, but the counsel for the defendants states in his brief that the original bill was filed October 9, 1889, and as that statement does not seem to be challenged by the opposite counsel, we may assume that to be the correct date.

If then it be admitted that the exchange by the complainant of his Chicago property for said Wisconsin lands was induced and brought about by the fraudulent representations of Slayton and Fenn as alleged, the transaction was not void but only voidable at the complainant's election, and if he wished to avoid it, it was incumbent upon him to make his election so to do promptly after becoming aware of the fraud. His continuing to treat the lands as his own, and especially his voluntarily proceeding with the construction of valuable improvements thereon and availing himself of the uses and profits thereof after becoming fully apprised of the facts, may be fairly held to establish an election on his part to affirm the transaction, and after having once made his election, he must be held to it, and can not be permitted afterward to rescind.

The rule on this subject is well stated in *Grymes* v. *Sanders,* 93 U. S. 55, as follows: "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." The rule is also laid down in 2 Pomeroy's Eq. Juris. sec. 897, as follows: "All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part.

If after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations." The doctrine of the text is supported by many authorities cited in the notes.

These rules are clearly applicable to this case. The manifest conclusion from all the evidence is, that as early as April or May, 1889, if not earlier, the complainant must have been aware of the truth in relation to the matters covered by the alleged false representations. If a large part of said lands was in reality a morass or marsh, much of it permanently covered with water and entirely worthless, he must have known so then. If the soil was as shallow as he claims, he must have known that also. If the lands produced only weeds and rushes mixed with a little wire-grass, that too must have very soon become apparent to the most ordinary observation. His attention therefore must have been called to the untruthfulness of the representations complained of immediately after the disappearance of the snow, and being thus put upon inquiry, it was clearly his duty, if personal observation did not furnish him all the information needed, to make due inquiries elsewhere. All needed means of information were at hand. His overseer and confidential employe was a man who had had charge of said lands for years under former owners. Various persons were living in the neighborhood who had long known said lands and who now appear as witnesses in his behalf as to their quality. If ordinary observation did not furnish him with information enough, it certainly furnished him with enough to make it his duty to use ordinary diligence in seeking to obtain more. He is shown to have conversed with his overseer and neighbors about said land, expressing his own satisfaction therewith, at various times down to the date of filing his bill, but he is nowhere shown to have attempted to ascertain from them the qualities and capacities of said lands as developed by the experiences of former owners.

But it is claimed that he did not fully learn the inferior quality and capacities of said lands, and the falsity of said representations, until the crop of hay had matured and been gathered, and therefore that he was not bound to make his election to disaffirm until after that had been done. It is clear that this contention, under the facts in this case, can not be sustained. The inferior quality of the hay crop was only cumulative evidence of the falsity of the representations, or at most only a new incident of the fraud. The case of *Campbell* v. *Fleming*, 1 Adolph. & Ellis, 40, is here in point. There a purchaser of certain shares of stock sought to disaffirm the sale and recover back the purchase money paid on the ground of fraudulent representations made to him in the course of the negotiations which resulted in the purchase. It appeared that after the discovery of the falsity of said representations, the plaintiff treated the stock as his own, and disposed of some shares of it, but after the discovery of a further element of fraud, he sought to disaffirm. In sustaining a judgment of nonsuit, Littledale, J., said: "No doubt there was at first a gross fraud on the plaintiff. But after he had learned that an imposition had been practiced on him, he ought to have made his stand. Instead of doing so, he goes on dealing with the shares; and, in fact, disposes of some of them. Supposing him not to have had, at the time, so full knowledge of the fraud as he afterwards obtained, he had given up his right of objection by dealing with the property after he had once discovered that he had been imposed upon."

We are of the opinion that the complainant in this case, by not acting promptly after the fraud was discovered, and by continuing thereafter to deal with said lands as his own property, waived and thereby lost his right to disaffirm the contract. The decree of the Circuit Court being in harmony with the views above expressed, will be affirmed.

*Decree affirmed.*