[No. 4970.]

## BROWN v. THE GORDON-TIGER COMPANY ET AL.

1. **Vendor and Vendee**—The vendee cannot assign as an excuse for his failure to make certain improvements, stipulated in the article of purchase to be completed within a specified period, a defect in the title, of which, at the time of his default, he was not informed.—P. 320.

Nor the failure of the vendor to furnish a schedule of liens against the property as stipulated for, where it appears that the purchaser's attorney had himself examined the records and prepared the schedule.—P. 321.

Nor the garnishment of vendee by a stranger, temporarily preventing the application of a part of the purchase money, by the vendee, to the discharge of liens upon the property, stipulated in the article of sale.—P. 321.

Nor the opinion of the engineer employed by the vendee that it was not advisable under the circumstances to make the improvements.—P. 321.

2. Contracts—Rescission—One who proposes to rescind a contract by reason of a fraud practiced upon him, inducing him to enter into it, must act promptly upon discovery of the facts. If he continue acting under the contract and recognizing it as in force, he is conclusively bound.—P. 322.

3. Vendor and Vendee—Part Failure of Title—Vendee, having stipulated for a perfect title, may have the price abated if title is not furnished to the whole.—P. 324.

### Error to Denver District Court.
### Hon. Peter L. Palmer Judge.

Messrs. STUART & MURRAY, for plaintiffs in error.

Messrs. TALBOT, DENISON & WADLEY, Mr. CHARLES D. HAYT, and Mr. FRED R. WRIGHT, for defendants in error.

This controversy grows out of a sale of a tract of land consisting of about one hundred and sixty-seven acres, situated in Lake county, in the state of Colorado, with a gold mine, known as the Gordon-Tiger mine, and a ranch and a mill site located thereon.

On the first day of April, 1900, this property was owned as follows: Constance H. Brown, the plaintiff below, owned an undivided three-fourths, and the other one-fourth belonged to the heirs of Belinda H. Brown, deceased, first wife of S. P. Brown, the present plaintiff being his second wife. The interest of Belinda H. Brown descended one-half to her husband, S. P. Brown, and the other one-half to her six children. One of the children, James W. Brown, the intervenor, who is a lunatic, owned a one forty-eighth undivided interest in the property. The property was incumbered with liens amounting to about $60,000. On the third day of April, A. D.

1900, S. P. Brown, acting for himself and all the other owners, entered into a contract with Daniel E. Murphy, wherein he agreed to assign, transfer and convey to Murphy, or to a corporation to be organized by him, by good and sufficient deeds of conveyance, free and clear of all incumbrances, and convey an absolute title in fee to the mining property, upon the following terms, to wit:  Murphy, or his successor, the corporation, was to pay off certain debts against the owners, aggregating about $60,000, which debts were to be scheduled by Brown and shown to be *bona fide* debts.  The payment of about $35,000 of said amount was to be made not later than April 5, 1900, to discharge or redeem from judicial sale an undivided three-fourths of the property, and the balance or remainder of said debts were to be paid as soon as practicable thereafter, and if they amounted to less than $60,000, the difference between the liens so paid and the $60,000 was to be paid to the party of the first part.  Brown was to furnish abstract showing good title in the premises conveyed, subject only to the incumbrances which were to be discharged by the party of the second part, and the contract expressly provided, "should said abstract fail to show such good and perfect title satisfactory to said attorneys aforesaid in the parties conveying or bound to convey under this contract, the said party of the second part shall not be required to make any payments hereinafter mentioned until the defects in said title, if any there be, are made good, and this will continue notwithstanding partial payments may have been made by the party of the second part."

It was understood by the parties that, while Brown contracted individually, he assumed to act for all the owners of the property, and in fact held powers of attorney from the other owners; and it

was also understood that in the purchase of the property Murphy was acting for the corporation to be organized, and that the title to the property was to be conveyed to said company and the company was to assume and pay to Brown the agreed consideration of $200,000 therefor at the times and in the manner specified in the contract, to wit: That about $60,000 was to be paid on the liens existing against the property, and the remaining $140,000 was to be paid in monthly payments after the mine was furnished with proper machinery and put in operation, out of one-half of the net profits or proceeds. The deeds to the property were to be put in escrow. The party of the second part was to operate the mines in a proper, workmanlike manner, without any unnecessary delay; the operation and development to be carried on under the charge of a reliable and capable mining engineer who was solely subject to the direction and instruction of the party of the second part. The party of the second part further agreed that the engineer should make arrangements for the early purchase of such machinery as he found to be necessary or advisable for the proper treatment of the ores of said mines, and for such labor as might be necessary for the erection of such machinery and the digging of such water ditches as he might deem advisable, and that he should make arrangements for the most desirable method of treating the ores by means of what he deemed a proper reduction plant, and that the amount of ore so treated by whatever process should not be less in tonnage than the daily tonnage of a twenty-stamp mill operating on such ores, subject only to ordinary delays and hindrances affecting ordinary mining operations, and also to strikes, fires, or events over which the party of the second part had no control; and it was further agreed that the net profits out of which the balance of

the payment for the property was to be made should mean the profits after deducting the costs of mining, transportation of ore, milling and reducing of same, and selling products, and should not include the original cost of buying and placing of machinery nor cost of property; the payments to the party of the first part to cease and determine when the total sum paid to said party, taken together with such sums as should be paid on account of debts and liens as aforesaid, should amount to the total sum of $200,000. It was further stipulated that when the full sum of $200,000 should have been paid in the manner aforesaid, the deeds to this property should be delivered to the party of the second part. It was further agreed that the mines and reduction plant should be kept in continuous operation by the party of the second part, subject only to ordinary delays and hindrances. It was also provided that in case the second party, after working said mines, should determine that they could not be worked profitably, it might surrender them to said party of the first part, and in such case the deeds in escrow should be returned and this agreement should be void, and the second party should not be held in damages, "but all moneys paid and all machinery, betterments and improvements added to said property by said party of the second part shall be forfeited to said first party as fixed and liquidated damages." The parties mutually fixed six months as a reasonable time for the party of the second part to get said plant in operation and put in said machinery, but if such time should extend over six months, he having used reasonable diligence, it should not be cause for a rescission or damages; payments to the party of the first part were expected to begin ninety days after said plant was in successful operation.

This contract was assigned by S. P. Brown to

the plaintiff, Constance H. Brown, on April 7, and
on April 9 another contract was drawn up and signed
by the same parties, wherein there were some slight
changes which are not material in this case, except
it was provided that the $60,000 should be applied
only to the payment of liens against the property.
After the signing of this second agreement Mr.
Brown and Mr. Denison, representing Mr. Murphy,
went to Leadville to complete the search of the title
and to pay off some of the most pressing liens. Upon
examination of the record Mr. Denison was not satis-
fied with the powers of attorney which Mr. Brown
held from the other owners, and he thereupon de-
manded of Mr. Brown that he furnish deeds from
all his children. He thereupon furnished deeds
signed by himself, Constance H. Brown, and all the
heirs of B. H. Brown, deceased, except James W.
Brown, conveying the property to Daniel E. Murphy.
Mr. Denison insisted upon a deed also from James
W. Brown. Mr. S. P. Brown then stated that James
W. Brown died two years before in Pueblo, intestate,
leaving no debts; that he had never been married;
and that he, S. P. Brown, as his father, was his only
heir. He also made an affidavit to the same effect.
This statement and affidavit were false. James W.
Brown was not dead, but at the time was insane and
incarcerated in an asylum in Pueblo, as S. P. Brown
well knew. Relying upon this statement and affi-
davit, Mr. Denison passed the title to the property,
and paid $33,017.09 for the McAllister judgment,
which was the pressing lien referred to in the con-
tract. This was done by buying the certificate of
purchase and taking a commissioner's deed direct to
Murphy, who put his deed in the escrow envelope
hereinafter mentioned. Afterwards the Stuart &
Murray claim for $15,107 and other liens and taxes
were paid, aggregating $49,433.63. The Gordon-

Tiger Mining and Reduction Company was organized pursuant to the contract, and a deed from Murphy to Constance H. Brown, together with a deed from her to the company, were put in an envelope indorsed as follows:

"To the Denver National Bank: The within deeds are to be delivered to The Gordon-Tiger Mining and Reduction Company, or to its order, upon showing to said bank by receipts of S. P. Brown or Constance H. Brown by herself or by S. P. Brown, her attorney in fact, or other evidence satisfactory to said bank, the payments of sums aggregating $200,000.

"This deposit is made in pursuance of a contract signed by said S. P. Brown and Daniel E. Murphy, dated April 9, 1900; said company is the corporation to be organized referred to in said agreement. If said company shall fail to pay said sums, or shall be in default over ninety days in the profits of the mine mentioned in said contract, or shall surrender said contract as therein provided, or shall fail for any time for ninety days to fulfil said contract by the continuous operation of said mines and mills or other reduction works, according to the tenor of said contract, then the within deeds are to be delivered to Constance H. Brown, or her order.

"John H. Denison is hereby substituted for said bank.

"Constance H. Brown, by S. P. Brown, attorney in fact.

"The Gordon-Tiger Mining and Reduction Company, Daniel E. Murphy, president."

On the ninth day of April, 1900, this escrow agreement was deposited with John H. Denison, and the actual possession of the property was turned over and delivered to The Gordon-Tiger Mining and Reduction Company under the contract, and from that

date to the present time the company has held and still holds the absolute and undisturbed possession thereof as its property. During this time the defendant has not furnished or placed on said property any stamp mill or other machinery for the treatment of the ores therein. It has not mined or removed or sold, or attempted to mine, remove or sell, any of the ore in said mine. It has not operated or attempted to operate any milling machinery on said mine for the treatment of ore. The work done by the defendant company in and about said mine consists in extending the tunnels thereon and thereby uncovering and exposing more ores, and in the erection of a new boarding house on the premises.

On March 11, 1901, the defendant company learned that James W. Brown was not dead, but confined as a lunatic in an asylum in Pueblo. It did not at that time elect to rescind the contract, but on the other hand elected to treat the contract as a valid, existing and continuing contract until after the expiration of twenty-one months after it was fully advised of said fraud.

On the twenty-fourth day of July, 1902, the plaintiff, Constance H. Brown, instituted this action, alleging as her cause of action the failure of the defendant to comply with and carry out the terms and conditions of the foregoing contract on its part, and its willful neglect and refusal to perform the obligations imposed upon it by the terms thereof, and asks that because of its default the defendant company be compelled to return the possession of the property to her, and all sums paid by the defendant company and betterments made under said contract be forfeited as fixed and liquidated damages, and that she may be decreed to be entitled to the deeds and conveyances in the hands of the trustee. She predicates her right to this relief upon the clause in

the contract which gives the defendant the option to surrender the property and forfeit all improvements and money paid if it shall determine. that the mines cannot be worked profitably, and also upon the language of the escrow agreement.

The defendant denies the plaintiff's right to the relief claimed, or to any relief, upon the ground that the plaintiff has failed to keep and perform the conditions of the contract upon her part by her failure to convey the title to the property agreed to be conveyed and in failing to furnish a schedule of the liens against the property, as by the contract she was required to do; and by its cross-complaint seeks to have the contract rescinded and that it be reimbursed for all moneys it has paid and expended thereunder.

The trial court awarded the defendant the relief asked, canceled the contract, and decreed that it was entitled to and should recover from the plaintiff all moneys expended by it under the contract, together with interest thereon, amounting in the aggregate to $142,000.

To reverse this judgment plaintiff brings the case here on error.

Mr. JUSTICE GODDARD delivered the opinion of the court:

It is manifest from the express provisions of the contract that the furnishing of the mill and machinery specified and the diligent operation of the mine were the principal inducements to Brown to sell the property, upon the condition that the balance of the purchase price should be paid only out of the profits derived from the ore mined and sold. To emphasize the importance of taking immediate control of the property by the company and the construction and continuous operation. of the reduction

plant, it was further provided that six months was sufficient time to procure and put the plant in operation, and while it was understood that, if the party of the second part could not, by using reasonable diligence, complete the plant within that time, it should not be cause for rescission or damages, yet it was expected that payments to the party of the first part would begin ninety days after the plant was in successful operation.

As above stated, the defendant did not place or attempt to place any mill or machinery of any kind or character on the mines; nor has it paid to the plaintiff any part of the agreed balance of the purchase price; nor has it attempted to comply with the contract in this or any other respect, except to pay the lien claims above mentioned; nor does it express any intent or desire to fulfill its contract, but offers excuses for its past and continuing failure to perform its important and material obligations imposed by the contract, which are manifestly frivolous and insufficient.

The defect in the title, however it may affect the rights· of the respective parties in other respects, certainly affords no excuse for, and was not the cause of, the delay in the erection of the mill within the time provided. During this time the defendant was under the impression that the title to the property was perfect. It did not ascertain anything to the contrary until about March 7, 1901, being about eleven months after the date of the contract. The condition of the title, therefore, cannot now be availed of as an excuse for its nonperformance in this respect.

Nor is there any merit in the further. excuse urged for its delay that Brown failed to furnish a schedule of the liens against the property. The contract of April 9 limited the application of the $60,000 to the payment of liens against the property. To

constitute a claim a valid lien against the property to the prejudice of the defendant, it must have appeared of record. The evidence discloses that Mr. Denison, as representative of the defendant, examined the records and made out a schedule of the liens appearing thereon. He, therefore, had all the information there was to be had in reference to such liens as existed against the property, and the defendant was fully protected by the deeds from Brown, which were of record, from any liens that might be recorded thereafter. The most that could be predicated upon the failure of Brown to furnish the schedule, if he did so fail, would be to give the defendant further time in which to make such payments. It could in no way operate to excuse the delay in building the mill.

As a further reason justifying the failure of the defendant to comply with its contract in its most important respect, was the fact that one Keegan brought suit against the Browns and garnished the defendant company, and thus tied up the balance of the $60,000. This garnishment having been ultimately discharged, at most delayed the application of the $10,000 to the purpose specified; and we do not think that this circumstance, nor the opinion of the engineer that he did not deem it advisable to build the mill under these circumstances, in any way justified the willful violation on the part of the defendant of the express provisions of the contract requiring an early purchase and erection of the mill and machinery.

The complaint sets out a cause of action, and the evidence introduced in support of its allegations discloses a state of facts that entitles the plaintiff to some relief, notwithstanding the fraudulent representations made by S. P. Brown in regard to the death of James W. Brown. Whether in the circum-

stances she is entitled to the specific relief asked, it is unnecessary, if not improper, to determine on the present review. It is sufficient to say that upon the evidence presented, the court below erred in holding that the defendant company was entitled to a rescission of the contract and to be reimbursed for the money expended thereunder. It may be conceded that the defendant had the right to rescind the contract upon the discovery of the falsity of the statement of S. P. Brown in regard to the death of James W. Brown, and his consequent inability to convey the title to an undivided one forty-eighth of the property by his own deed, as he purported to do; but having failed to avail itself of that right in apt time and by recognizing the contract as in force thereafter, it waived the right to rescind, and became as conclusively bound by the contract as if the fraud had not intervened.

This rule is too well settled to admit of controversy. In *Grymes v. Sanders et al.*, 93 U. S. 55, 62, the rule is thus stated:

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."—*Shappirio v. Goldberg*, 192 U. S. 232; *Richardson v. Lowe*, 149 Fed. 625; *Auld v. Travis*, 5 Col. App. 535; *Stockham v. Adams*, 96 Ill. App. 152.

In *Richardson v. Lowe*, *supra*, Judge Adams, speaking for the court, said:

"Rescission of a contract on the ground of fraud is not a mental process undisclosed and unacted

upon.   It requires affirmative action immediately on
its discovery; some overt act and outward manifesta-
tion of the intention to clearly apprise the other
party to the contract of the right asserted.—*Melton
v. Smith*, 65 Mo. 325; *Walters v. Miller*, 10 Iowa 427.
*   *.  *   The following cases afford apt and per-
suasive authority for the application of the doctrine
to this case:   *Romanoff Mining Co. v. Cameron*, 137
Ala. 214, 33 South. 864; *Shiffer v. Dietz*, 83 N. Y.
300; *Booth v. Ryan*, 31 Wis. 45; *Greenwood v. Fenn*,
136 Ill. 146, 26 N. E. 487; *Dennis v. Jones*, 44 N. J.
Eq. 513, 14 Atl. 913, 6 Am. St. Rep. 899; *Downer v.
Smith*, 32 Vt. 1, 76 Am. Dec. 148.   The duty of
rescinding arises immediately upon acquiring knowl-
edge of the substantial and material facts constitut-
ing the fraud.   It is not requisite that the defrauded
party shall be acquainted with all the evidence con-
stituting the fraud before the duty to act by way of
rescission arises.—*Campbell v. Flemming*, 1 A. &
E. 40; Fry Sp. Perf. Cont. (2d ed.), §§ 703, 704;
*Bach v. Tuch*, 126 N. Y. 53, 26 N. E. 1019; *Taylor v.
Short*, 107 Mo. 384, 17 S. W. 970.   When he has evi-
dence sufficient to reasonably actuate him to rescind
the contract and on which he has once acted, no sub-
sequent discovery of cumulative evidence can ope-
rate to excuse waiver of the fraud if one has in the
meantime occurred, or to revive a once lost right of
rescission.   The election to waive the fraud, once
deliberately made, is irrevocable.   Vacillation or
speculation cannot be tolerated.''

The defendant, having waived the right to
rescind the contract upon the ground of Brown's
fraudulent representation, is conclusively bound by
the contract and cannot now urge the defect in the
title as an excuse or justification for its failure to
perform the obligations imposed upon it by its ex-
press terms; in other words, it cannot retain the

possession of the property and successfully evade its obligations thereunder. In the event that it shall carry out the contract on its part and the defect in the title is not "made good," as provided in the contract, any damages it may suffer by reason of such defect can be availed of as a defense *pro tanto* to the recovery of the purchase price.

Since it becomes necessary to reverse the judgment of the court below and remand the cause for the reasons already given, it becomes unnecessary at this time to consider the refusal by the court to permit the plaintiff, through the intervention of the conservator of the lunatic, to supply the title to the undivided one forty-eighth interest.

The judgment is reversed and the cause remanded.                    *Reversed and remanded.*

Decision *en banc.*

Mr. JUSTICE CAMPBELL and Mr. JUSTICE MAXWELL not participating.