## White Brass Castings Company v. Union Metal Manufacturing Company et al.

### Gen. No. 13,182.

1. CONTRACT—*how question of whether entire or severable to be determined.* The question whether a contract is entire or severable cannot be determined by any precise rule, but must depend upon the intention of the parties, which in each case is ascertained from the language employed and the subject-matter of the contract.

2. CONTRACT—*when entire.* A contract by which certain tangible property is acquired, together with certain patent rights, is held entire, notwithstanding a separate valuation was placed upon the tangible property.

3. RESCISSION—*how must be made.* A party will not be permitted to affirm a contract in part and rescind as to the residue. If he rescinds at all he must do so *in toto.*

4. RESCISSION—*effect of delay upon right of.* Where a party desires to rescind upon the ground of mistake or fraud, he must, upon a discovery of the facts, at once announce his purpose and adhere to it. If he be silent and continue to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract as if the mistake or fraud had not occurred.

Bill for injunction, etc. Appeal from the Superior Court of Cook county; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1906. Affirmed. Opinion filed June 14, 1907.

**Statement by the Court.** This is an appeal from a decree of the Superior Court dismissing the bill of appellant for want of equity.

The bill of complaint as amended sets forth that in 1903 the Union Metal Manufacturing Company was engaged in the business of casting metal (hard and soft); that it was financially embarrassed; that John West was its president and Edwin McNeal its secretary; that these two officers, by themselves, and one William A. Winterburn—their agent and promoter employed for the purpose—by means of false and fraudu-

lent representations, induced John H. Winterburn and Nicholas E. Murray to enter with them upon the organization of the complainant company for the casting of hard metal and to invest $4,000 in the stock of said complainant. That John H. Winterburn is a brother of William A. Winterburn—the promoter—and the father-in-law of Nicholas E. Murray, and that West and Murray were warm friends and members of the same social circle.

That it was the avowed purpose of the defendants to organize the complainant company and to sell to it certain patents for the casting of metal, theretofore invented by said West; and the false representations consisted in the statement made by them that the Union Metal Manufacturing Company was then the owner of the patents, whereas neither it nor West had any ownership or interest in said patents, and neither the patents nor any rights therein were, in fact, ever conveyed to complainant.

That the said Murray and John H. Winterburn agreed, on behalf of the prospective company—the complainant—to pay for said patents $60,000 in stock of complainant.

That thereafter said Murray and John H. Winterburn made another contract in behalf of the new company, by which they agreed to pay $2,000 in cash for the other property, good will, etc., etc., of the Union Metal Mfg. Co.

That complainant corporation was then organized, the money on the second contract—reduced by agreement from $2,500 to $2,000—was paid, and the $60,000 in stock was duly transferred to the defendants, including the principal persons already named as defendants, their wives, mothers, mothers-in-law and other nominees of the defendant company.

That some time after the making of the two agreements above described, the defendants caused one of West's alleged confederates, an attorney at law named

G. G. Barry, to draw up a written contract. This is the contract of May 7, 1903, complainants' exhibit B.

The contract as drawn by Barry sets forth that the first party has sold to second party all the machinery, furnaces, etc., etc., office furniture, books, etc., and "the exclusive right to all of the letters patent, inventions, formulas, recipes, good will, brands, trade rights and manufacturing processes owned or in any way controlled by the first party and used in the hard white metal business," first party reserves the right to use the patents, etc., in soft metal business.

"The second party hereby accepts the property and rights by the first party sold * * * and in consideration thereof hereby agrees to pay to the first party Twenty-five hundred dollars in cash and further to issue to it 'or its nominees' certificates of stock of the second party to the aggregate amount of six hundred shares."

That said contract does not correctly represent the agreement of the parties, in that it fails to treat the two agreements as separate and distinct transactions, made at different times, and attempts to combine the two as one entire contract. That Murray raised the question when the contract was read, but was reassured by the statement of the lawyer, Barry, that that was in accordance with the usual form.

That thereafter the board of directors of complainant passed the following resolution:

Resolved, that this company accept the offer of the Union Metal Manufacturing Company to sell to this company the property described in the resolution of the stockholders passed May 7, 1903, authorizing the purchase thereof; and the board of directors do hereby adjudge and declare that said property is of the fair value of $60,000 and that the same is necessary for the business of this company; and it is further resolved, that the proposed agreement for the sale of said property presented at this meeting be and the same is hereby approved as to form and the president

and secretary of the company are authorized and directed to execute said agreement in the name and on behalf of this company and to affix the corporate seal. Further resolved, that the president and treasurer be and they are hereby authorized and directed to issue the full paid capital stock of the company to the aggregate amount of $60,000, as provided in said agreement.

That said resolution was passed by three of its five directors, and one of these three was West himself, who was at that time the president and a director of the defendant company, and that the resolution was, therefore, *ultra vires* and void.

That some time after the organization of complainant, and the transfer of the 600 shares, to wit, in the summer of 1904, the complainant, by its officers, Murray and J. H. Winterburn, discovered that neither West nor the Union Metal Mfg. Co. at the time said representation or said contract was made had any right in or title to said patents, and that these had been sold years before to Barnhart Bros. & Spindler for a consideration of $600.

That the complainant never, in fact, received a cent of consideration in money or in any form for its 600 shares of stock. That the defendants are financially irresponsible and a judgment would be of no value or avail. That the complainant, J. H. Winterburn and Murray, relied upon said false representations in making the agreement, and that in making it they had in view the acquisition of the patents which were represented by the defendants and believed by Murray and J. H. Winterburn to be of very great value.

The bill prays for a cancellation of the agreement relating to the 600 shares of stock, and for a cancellation of said stock unless the holders are willing to pay for it, and for an injunction against its further sale or transfer, and for general relief.

The answers of the defendants deny in the main the allegations of the bill, say that the representation was that the Union Metal Mfg. Co. controlled the patents,

in so far as they applied to its business, but the right of making type by means of said patents had been sold; that the property and rights turned over were well worth the sum of $62,500, and that large profits have been made with said processes; that the contract of May 7 was read at the meeting of the stockholders and directors of complainant company, paragraph by paragraph, and sentence by sentence, and correctly represented the agreement of the parties thereto; that the property other than the patents transferred by the defendant company to complainant was of great value; that no one ever questioned the right of the complainant to use said patents and that complainant did make use of them for a time.

That one Frederick DeCardy, while in the employ of the defendant company, perfected an invention which was highly useful and beneficial in the casting of metal, and that some time thereafter he secured or caused to be secured a patent on this invention in the name of the White Brass Castings Company.

That, by means of the use of the West patents and property transferred by the defendant company and the DeCardy invention and the efforts of the defendants, the complainant had been enabled to make great profits, about $17,000. That all their representations were true.

The master to whom the cause was referred found the issues of fact in favor of the defendants and found against the charges of fraud and conspiracy.

On the argument of the exceptions to the master's report, the Superior Court rejected the findings of fact by the master, found the charges of the bill as to fraud and conspiracy to be clearly established by the evidence, but held that the contract of May 7 was one entire contract and could not be legally separated, and upon this ground entered a decree for the defendants.

The contract, a portion of which the bill seeks to set aside and rescind, is as follows:

White Brass Castings Co. v. Union Metal Mfg. Co.

"This Agreement, made at Chicago, Illinois, this 7th day of May, 1903, by and between the Union Metal Manufacturing Company, first party, and the White Brass Castings Company, the second party hereto, (both of said parties being corporations organized under the laws of the State of Illinois).

Whereas, the first party is the owner of the business, good will, patents, inventions, secret processes, property and rights hereinafter described; and

Whereas, the second party desires by a cash payment and the issue of its capital stock, as hereinafter provided, to purchase and acquire said business, good will, patents, inventions, secret processes, property and rights; and

Whereas, the Board of Directors of the second party have ascertained, adjudged and declared that the said business, good will, inventions, processes, property and rights are of the full fair value of Sixty-two thousand Five Hundred dollars, and that the acquisition of same is necessary for the business of the second party and to carry out its contemplated objects,

Now, Therefore, This Agreement Witnesseth:

(1)   That the first party has sold, assigned, transferred and set over, and does hereby sell, assign, transfer and set over unto the second party, its successors and assigns, all its right, title and interest in and to the following, to wit:

(a)   All the machinery, furnaces, pumps, heaters, boxes, stands, castings, pipes, tanks, shafting, belting, pulleys, hangers, tools, implements, utensils, jokers, nipples, patterns, molds, dies, metal supplies, and property of every nature whatsoever belonging to the first party which relates to or is used in connection with that branch of the business of the first party known as the Hard White Metal Department.

(b)   The office furniture, books, stationery, supplies, correspondence, customers. trade lists, and all data pertaining to that branch of the business of the first party now herein sold to the second party.

(c)   The exclusive right to all of the letters patent, inventions, formulas, recipes, good will, brands, trade rights and manufacturing processes owned or in any way controlled by the first party and used in the Hard

White Metal business, but subject to the limitations in clause 'd' hereof.

(d) It is mutually understood and agreed that the right to patents, etc., referred to in the foregoing clause 'c', covers the same only in so far as the hard white metal business is concerned, i. e., where, for example, an invention or process is used in both the soft metal and the hard metal departments of the first party, the first party does not preclude itself from continuing the same in the soft metal business which it is conducting, but the 'exclusive rights' to the second party apply only to the hard metal business herein acquired by the second party, and the first party, its successors, assigns, or licensees are excluded from using same in competition with the second party in the conduct of its hard metal business.

(2) The second party hereby accepts the property and rights by the first party sold, assigned, transferred and set over unto it as aforesaid, and in consideration thereof hereby agrees to pay to the first party Twenty-five hundred dollars in cash and further to issue to it or to such nominees as the said first party shall in writing hereafter direct, at such times and in such amounts as shall by the first party be directed, certificates of stock of the second party to the aggregate amount of six hundred shares, and said shares shall be deemed to be and are hereby declared to be, full paid shares and not liable to any further call, and the holders of such stock shall not be liable to any further demands thereon.

(3) Certificates of such stock shall be issued in part as follows:

John West .......................200 shares.
Wm. DeCardy ...................100    "
John J. McElroy ...............100    "
E. McNeal .....................100    "
Fred DeCardy ..................100    "
.............................................
.............................................
.............................................
.............................................

(4) It is understood and agreed that the shares of stock to be issued under the terms of this contract

may be issued (at the nomination of the first party) to any of the subscribers to the capital stock of the second party as set forth in the subscription agreement; and the delivery of the certificates to the first party or the parties designated by the first party, and their respective receipts for the same, shall be a full discharge of each of the parties to the extent thereof.

(5)   It is further agreed by the first party that it will not engage or be or become interested, directly or indirectly, in the business of manufacturing, selling and dealing in hard white metal goods herein sold to the second party.

(6)   It is mutually agreed by the parties hereto that they will each give and grant to the other the benefit and advantage of all improvements, information or knowledge acquired by one and of use in the business of the other; that all processes, inventions or patents developed or acquired by the one will be made known to the other, if of use in its business, with the privilege of using same in its business; the intent being that the said parties shall work in harmony in their respective businesses, and do all that can consistently be done to promote the interests of each other without interfering with their own business.

(7)   The first party hereby further covenants and agrees with the second party, upon the request and at the cost of the second party, to execute and do all such further assurance and things as shall reasonably be required by the second party for vesting in it the property and rights herein to it sold, transferred, assigned and set over, to give to the second party the full benefit of this agreement; and also to cause the original inventors of such of the patentable improvements, etc., herein sold, and upon which applications for letters patent have not yet been filed, to properly execute applications for letters patent, in this and any other country, and, as well, the proper assignments thereof to better vest in the second party their rights under this agreement, whenever it may be deemed advisable to have such application or instruments executed.

In Witness Whereof, the parties hereto have caused this agreement to be signed in their respective names

by their proper officers and attested by their corporate seals, the date and place first above written.

UNION METAL MFG. CO.
By  JOHN WEST, President.
E. McNEAL, Secy.
WHITE BRASS CASTINGS CO.
By  N. E. MURRAY, Pres.
W. A. WINTERBURN, Secy.''

BLUM & BLUM, for appellant.

SIMON LA GROU and JOHN C. FARWELL, for appellees.

MR. JUSTICE SMITH delivered the opinion of the court.

No offer to return anything received under the contract is made in the bill. It is conceded by counsel for appellant in argument that no offer or tender to return or restore had been made in fact by complainant, but it is claimed that complainant's (appellant's) right to relief could be in no way prejudiced by its failure or inability to restore the *statu quo,* for the reason that the two agreements, namely: the agreement relating to the patents and the shares of stock and the agreement relating to the purchase of the machines, molds, metals and tangible property, were separate and independent transactions; and that the agreement relating to the tangible property having been fully executed, is eliminated as a factor in the case.

It is also conceded by counsel for appellant that if the contract of May 7, 1903, is entire and not severable, appellant is not entitled to relief.

In Keeler v. Clifford, 165 Ill. 544, 547, it is said: ''The question whether a contract is entire or severable, cannot be determined by any precise rule, but must depend upon the intention of the parties, which in each case is ascertained from the language employed and the subject matter of the contract.''

In Clark v. Baker, 5 Met. 452, a contract for the sale of a cargo of white and yellow corn, the quantity being unknown, at a certain price per bushel for the

yellow and another price for the white corn, was before the court, and it was held to be an entire contract. The court said: "If the contract is entire, if it be one bargain, then it matters not if there be one or many articles, and though each may have an appropriate price. In the one case the vendor might have been unwilling to sell one portion without selling the whole; in another the buyer might not be willing to take a part unless he could have the whole."

To the same effect is Norrington v. Wright, 115 U. S. 188; and in Coos Bay Wagon Co. v. Crocker, 4 Fed. 577, it is said: "Whether a contract is entire or severable depends upon the intention of the parties to be gleaned from all the facts and circumstances in the case."

Directing our attention then to the facts and circumstances shown by the record, and then to the contract itself, we find that prior to 1903, John West had invented certain processes for casting hard metal and not adapted for use in the soft metal business carried on by the Union Metal Manufacturing Company. In January, 1903, that company had commenced manufacturing hard white metal goods under said processes, having two departments, one for hard metal and the other for soft metal. In January, 1903, it was decided by the managers of the Union Metal Company to separate the business of these departments and to organize a separate company to take over the hard metal department as it then stood, including rights to patents, good will, books of account, trade lists, machines, dies and everything belonging to that department.

Shortly afterwards, in February, 1903, negotiations were begun between Nicholas E. Murray, John H. Winterburn and John West, who was president of appellee, the Union Metal Manufacturing Company, looking to that end, and it was agreed by all the parties that a corporation with a capital stock of $100,000 should be formed and that West and his associates in the Union Metal Manufacturing Company should have sixty per

centum of the capital stock of the proposed corporation and $2,500 in cash for all the property belonging to the Union Metal Mfg. Company in its hard metal department, including patent rights and processes belonging to the Union Metal Manufacturing Company necessary to carry on the hard white metal business.

Thereupon Murray and Winterburn, with Fred De-Cardy, an employe of the Union Company, made application to the Secretary of State of Illinois and appellant company was organized. In the meantime, while the organization was being perfected, Murray and his associates took actual possession of the hard white metal business, including certain orders for goods which had been received, and proceeded to conduct the business and made payment of cash on the $2,500 cash payment agreed upon.

After the incorporation of appellant was completed the contract of May 7, 1903, was prepared and duly signed, thus completing the formal transfer of the property and business.

It clearly appears, we think, from the record that it was the intention of all parties interested to turn over the hard metal department of the appellee company's business to the appellant, including machinery in operation, molds, metals and everything in the way of apparatus used in the hard metal business, and all business, good will, inventions, rights to letters patent and manufacturing processes owned by the appellee company as a going business. It is also clear, in our opinion, that Murray, Winterburn and appellant company when organized had no intention to take the tangible property for the cash consideration named without at the same time acquiring the rights to manufacture under the patents, for the machines, molds, metals, etc., without the right to use the processes and manufacture, would be of no value. The same considerations would appeal to West and his associates, on the other hand, for they were proposing to take sixty per centum of the stock in the appellant company, which would be

worthless if the company had no right to manufacture and conduct the business for which it was organized.

Without stopping to analyze the terms and provisions of the contract, for the purpose of gathering the intention of the parties to it from its terms and provisions, we content ourselves by saying that the contract, after expressing the purpose of the parties as above indicated, describes and enumerates the property sold and transferred thereby in four paragraphs. The next paragraph declares the acceptance of the property and rights and in consideration thereof the second party, appellant, agrees to pay first party twenty-five hundred dollars in cash and issue to the nominees of the first party as directed six hundred shares of its stock; and in a following paragraph provides to whom the six hundred shares shall be issued.

Considering all the facts and circumstances leading up to the making of the contract, the language employed and the subject-matter of the contract, we are of the opinion that it is an entire contract for the sale of a going business with "the exclusive right to all of the letters patent, inventions, formulas * * * and manufacturing processes owned or in any way controlled by the first party" (subject to the limitations therein expressed), and the tangible property described, and that it is not a severable contract. It was one bargain, one transaction, although there was a separate valuation and price fixed for the tangible property, as distinguished from the other property.

As we have seen from the prayer of the bill, appellant does not seek to set aside the entire contract, but seeks to rescind on the ground of fraud the part of the contract relating to patents and processes and retain the benefits of the other parts of the contract. "The rule of law is as well settled as any can be that a party will not be permitted to affirm a contract in part and rescind as to the residue; if he rescinds at all he must do so *in toto*. The opposite party must be placed in as good a position as he was before the sale, by a re-

turn of the property purchased, unless it is entirely worthless." Bollnow v. Novacek, 184 Ill. 463, 470; Harzfeld v. Converse, 105 Ill. 534, 538. In recognition of this principle counsel for appellant makes the concession above stated, that appellant is not entitled to the relief asked unless the contract is severable.

If, however, we are in error in our conclusion as to the entirety of the contract, the question then is whether complainant, appellant, is entitled to the relief sought under the evidence.

Counsel in discussing the merits of the case refer to certain findings of the decree. We do not understand that special findings have any place in a decree dismissing a bill of complaint for want of equity. We are aware of no authority or precedent in equity practice for such findings. They perform no useful function and records should not be encumbered with them.

It appears from the record that Murray and Winterburn and their associates became interested in the proposition made by the appellee, Union Metal Manufacturing Company, to turn over its hard metal department as it then stood, including rights to patents and everything enumerated in the contract of May 7, 1903. Before the appellant company which was designed to take over this business was formed, Murray and his associates took charge of the property and business of the hard metal department, paid $300 on account of the cash payment agreed upon and began paying rent to the Union Metal Company for the space the business occupied. Ultimately, either before the appellant company was fully organized or afterwards, Murray and his associates contributed various amounts aggregating $4,000 to the business, and for this they received two hundred and ten shares of stock of appellant company.

Prior to these negotiations and the purchase of the hard metal department of the Union Metal Co., Frederick DeCardy was in the employ of that company and had perfected an invention for the use of compressed

air in this department of the business and the company had negotiated for the purchase of what is called in the record the "Helmhold" machine for the purpose of applying to it the DeCardy invention.    But through failure to agree upon a price, nothing was done.

After the incorporation of appellant company the contract of May 7, 1903, was signed and executed by the parties.    Before it was signed it was read over by the parties, as the evidence shows, and all understood its contents at the time.    No inquiry or investigation had been made prior to the execution of the contract and no question appears to have been raised at that time as to the right, title or interest in the patent under which they were operating.    The language of the contract which was prepared and submitted for complainant, appellant, to execute, particularly clauses "(c)" and "(d)" of the contract, was well calculated to arouse the suspicion and provoke inquiry, if an absolute assignment and transfer of parties was expected or had been agreed upon.    After enumerating the property in clauses (a) and (b) which was being transferred by the contract, clauses (c) and (d) are as follows:

"(c)   The exclusive right to all of the letters patent, inventions, formulas, recipes, good will, brands, trade rights and manufacturing processes owned or in any way controlled by the first party and used in the Hard White Metal business, but subject to the limitations in clause 'd' hereof."

"(d)   It is mutually understood and agreed that the rights to patents, etc., referred to in the foregoing clause 'c' covers the same only in so far as the hard white metal business is concerned, i. e., where, for example, an invention or process is used in both the soft metal and the hard metal departments of the first party, the first party does not preclude itself from continuing the same in the soft metal business which it is conducting, but the exclusive rights 'to the second party apply only to the hard metal business herein acquired by the second party, and the first party, its successors, assigns or licensees are excluded from using

same in competition with the second party in the conduct of its hard metal business.' ''

This contract, in other words, does not purport to convey or transfer any specific patent absolutely. It transfers to appellant what it owns and uses in the department of its business which appellant took over, and nothing more. If it had been distinctly and specifically agreed between the parties that the patents themselves, covering the rights and processes necessary for the business in question, should be transferred, and that appellant and Murray and John H. Winterburn relied upon receiving the patents and invested $4,000 in the stock of the new company upon the faith that it would receive the patents themselves, and not the mere right to manufacture and sell as owned and used by the Union Metal Manufacturing Company, they knew or ought to have known and were chargeable with the knowledge, at the time of executing the contract, that no patents were assigned in and by the contract and that no papers were executed and delivered to them covering that important part of the alleged agreement.

The contract was under contemplation from the middle of March to the date of its execution. Deliberation, not haste, is shown in the whole proceedings. No unfair advantage or deception is shown in the circumstances surrounding the execution of the contract. In our opinion, the appellant should have insisted at the time upon the assignments and transfers of patents either in the contract or by other papers, if it had any such rights under the verbal agreement or understanding between the parties; and that under the circumstances all such agreements must be held to have been merged in the contract of May 7, 1903.

It clearly appears that appellant under the contract became the owner of the DeCardy invention, and that about May 27, 1903, it purchased the ''Helmhold'' machine for a nominal sum and applied the DeCardy invention to it with little delay and in a short time it was

in active operation. The air process was also applied to the West machines within a year, and it has been used from that time until the bill was filed, taking the place of and superseding the West patents in the business of appellant.

With the good will, trade lists, etc., were turned over under the contract large orders then in hand. To these a large and profitable business is directly traceable, which has made a profit during the two years and eight months of the business, as shown by the evidence, of an average of ten per cent. yearly upon the face value of the 600 shares, and the $4,000 cash invested by Murray and his associates.

It appears that appellant was never interfered with in the enjoyment of its rights under the West patents while it operated under them. It enjoyed its exclusive rights received from the Union Metal Manufacturing Company until those rights were superseded by other and better methods, which it also received from that company under the contract. It has accepted and made its own the benefits of the contract and proposes to return nothing while it asks for a cancellation of that part of the contract by which 600 of its shares of stock were issued.

The evidence shows that it was at first agreed in March, 1903, between West and his associates and Murray and his associates, that the latter should acquire the shares of stock in appellant for which they had subscribed at $40 per share, par value being $100 per share; and that some time afterwards this agreement was modified by West and his associates who held or were to hold six hundred shares of the capital stock, and by Murray and his associates, so that the latter were to have the two hundred and ten shares subscribed for by them for $20 per share, instead of $40 per share. This is all they have ever paid for their stock.

No certificates of stock except the 600 shares to West

and his associates and 210 shares to Murray and his associates have ever been issued, the remaining shares being held as treasury stock.

It clearly appears, we think, from the bill of complaint and the evidence, that no objections were made at any time to the right or propriety of the holders of the 600 shares of stock to take part in the management of the affairs of the corporation, and acting as stockholders and directors until about the time of the filing of the bill of complaint, although the knowledge that John West had transferred the patents in question to Barnhart Bros. & Spindler came to appellant as early as May 14, 1904. The bill was filed on October 5, 1905. The fraud charged and relied upon in the bill was, therefore, known to appellant about eighteen months before the bill was filed. During this time appellant continued to avail itself of the use of the patent rights and other property received from appellee company under the contract, and of the profits of such use. This may fairly be held, we think, to establish its election to affirm the transaction. It was said in Grymes v. Sanders, 93 U. S. 55, quoted in Greenwood v. Fenn et al., 136 Ill. 146, 158: "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent and continue to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." See also 2 Pomeroy's Eq. Juris., sec. 897; Follett v. Brown, 188 Ill. 244; O'Donnell & Duer Bav. V. Co. v. Farrar, 163 Ill. 471; Cunningham v. Fithian, 2 Gilm. 650; Naugle v. Yerkes, 187 Ill. 358.

The bill and appellant's contention proceeds upon the theory that there was a distinct agreement and understanding from the beginning that appellee, the

Union Metal Manufacturing Co., should transfer absolutely the patents owned by it covering the machines and processes used in its hard white metal department. We do not think the evidence justifies this theory or contention. The evidence does not show that the character of the rights to be transferred was discussed definitely in the preliminary negotiations, further than that the appellant was to have the exclusive right to manufacture hard white metal specialties under said patents. Without extending our discussion, already too long, we think the evidence shows that a practically exclusive right to use the patents and inventions in its business was transferred to appellant.

Upon the whole record and considering the evidence relating to the preliminary negotiations, the contract itself, the inability or failure to restore or offer to restore the property and benefits received and enjoyed by appellant, the delay in filing the bill and what seems to us to be a substantial performance of the contract by appellee company, a case is not made out justifying a court of equity in decreeing a rescission of the contract as prayed.

The decree is affirmed.

*Affirmed.*