## NATHAN FOLLETT

### *v.*

## HARRY BROWN.

*Opinion filed December 20, 1900.*

FRAUD—*a party desiring to rescind for fraud must act promptly.* A party who desires to rescind a transaction for fraud must, upon discovery of the facts, announce his purpose and adhere to it, and cannot be permitted to stand passive and speculate as to whether he will rescind the transaction or waive the fraud, as the events of the future may determine it to be most profitable for him.

*Brown* v. *Follett*, 88 Ill. App. 489, affirmed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

PECK, MILLER & STARR, for appellant:

The representations made by Brown to Follett were material, and being false, entitled Follett to rescind the contract. *Brewing Co.* v. *Farrar,* 163 Ill. 471; *Allen* v. *Hart,* 72 id. 104; *Hicks* v. *Stevens,* 121 id. 189; *Briggs* v. *Dunne,* 168 id. 226; *Eaton* v. *Winne,* 20 Mich. 156.

So long as he has made no election, the defrauded person retains the right to determine it either way, provided that in the interval an innocent third person has not acquired an interest in the property or the position of the wrongdoer is not substantially changed. Delay is only evidence of waiver. 1 Bigelow on Fraud, 437, 438.

Delay for the purpose of deliberation longer than a reasonable time to disaffirm the contract will not defeat the right to rescind, if during such delay the position of the vendor has not been altered. *Whitcomb* v. *Denio,* 52 Vt. 382; *Warner* v. *Tyler,* 81 Ill. 15.

It is always sufficient for a party to show that his apparent *laches* has arisen from a reasonable cause or has

been acquiesced in by the other party. *Nance* v. *Dunlevy*, 7 Blatch. 172; *Williston* v. *Williston*, 41 Barb. 635.

The right to rescind a contract for fraud is not waived by a delay caused by efforts to compromise the matter. *Brewing Co.* v. *Farrar*, 163 Ill. 471; *Courtland Manf. Co.* v. *Platt*, 83 Mich. 419.

When subsequent acts are relied upon as a defense in a case where fraud is clearly established, the acts must stand upon the clearest evidence and must evince a purpose to waive the fraud, and must amount to a clear election not to rescind. *Tarkington* v. *Purvis*, 128 Ind. 186.

A mere offer to sell the property, or a declaration of its value, does not constitute a waiver of the right to rescind. *Pierce* v. *Wilson*, 34 Ala. 596; *Watts* v. *Mortgage Co.* 60 Fed. Rep. 483.

The offer to restore the consideration was made in apt time and was a good and sufficient tender. *Higham* v. *Harris*, 108 Ind. 246; *Duff* v. *Hutchinson*, 57 Hun, 153; *Smith* v. *Howlett*, 51 N. Y. Sup. 910; *Halpin* v. *Brewing Co.* 47 id. 412; *Brown* v. *Norman*, 65 Minn. 369.

M. L. THACKABERRY, for appellee:

Representations, to warrant a rescission of a contract, should be of a fact or facts, and plain in their meaning, and reference should be explicit, concrete and definite, and not general or doubtful. *Tuck* v. *Downing*, 76 Ill. 71; *Walker* v. *Hough*, 59 id. 380; *Dillman* v. *Nadlehoffer*, 119 id. 577; *Fauntleroy* v. *Wilcox*, 80 id. 477.

There was no legitimate offer made to rescind the contract, such as is required by law. *Buchenau* v. *Horney*, 12 Ill. 338.

A party attempting to declare a rescission of a contract, who afterwards exercises acts of ownership over the subject matter of the contract, treating it as his own, will be held to have waived all his rights to rescind. *Sutter* v. *Rose*, 169 Ill. 70; *Day* v. *Investment Co.* 153 id. 305; 2 Pomeroy's Eq. Jur. sec. 897.

If appellant desired to have a rescission of the contract, he should have offered to place appellee *in statu quo* in every particular. This ability to restore the thing purchased unchanged in condition is indispensable to the exercise of the right to rescind, so that if the purchaser has innocently changed that condition, while ignorant of the fraud, he cannot rescind. Follett learned of the fraud the first week he was in possession of the hotel, if any fraud was practiced upon him, and afterwards changed the condition of many things in and about said hotel. He did not place appellee *in statu quo*, but, on the contrary, appellee was obliged to gain possession of said premises by a writ of restitution and by the foreclosure of the chattel mortgage and sale thereunder, hence appellant is not entitled to a rescission. Benjamin on Sales, sec. 452; *Brady* v. *Cole*, 164 Ill. 120.

Per CURIAM: In deciding this case, the Appellate Court delivered the following opinion:

"This is an appeal from a decree in equity ordering the rescission of a certain hotel lease and a bill of sale and chattel mortgage of the hotel furniture, and adjudging that appellant pay to appellee $3000 that was paid by him as the purchase price of the furniture, and $440.80 damages. The decree is upon the theory of the bill of fraudulent and injurious misrepresentations made by appellant to the appellee as to the amount and character of the business done by appellant in carrying on the hotel for some time prior to the transaction, and of reliance by appellee upon such representations believing them to be true, to such an extent as entitled the latter to rescind the contract. All fraud was denied by the answer, but the evidence established it, we think, so clearly as to abundantly justify the findings of the chancellor in respect thereof.

"All the evidence was heard in open court by the chancellor, and what amounted, in effect, to an account-

ing between the parties, vendor and vendee, covering a period of about ten months during which it was operated by appellee, was gone into by the chancellor without the intervention of a master in chancery. Such accounting involved the consideration and balancing against each other of the profits and losses of the business during the time mentioned, and included the receipts of the business, on the one side, aggregating between $5000 and $6000, and the running expenses of the hotel on the other side, including, among other things, supplies and wages paid, and an item of personal compensation to appellee at the rate of $900 a year by way of salary. An attentive consideration of such accounting and its method of proof, convinces us that it was of a kind that a court, unaided by a reference to a master, may not properly enter upon. The proper practice in such a case would have been to give an interlocutory decree of rescission and a reference to a master in chancery to take the account, and thus settle the equities in regard to the terms upon which it would be enforced. But inasmuch as, if such a course had been pursued, there would have then remained the broader question already existing, of whether the appellee, having the original right to rescind, so conducted himself with relation to the transaction, after he came into full knowledge of the fraud that had been practiced upon him, as to be entitled to rescind at the late period that he first sought to exercise that right, we prefer to place our decision upon that question.

"It is a settled principle in equity that one who has been misled and defrauded shall not be permitted, after he learns of the fraud, to stand passive and speculate upon the election that the law gives to him either to rescind the contract or waive the fraud, as the events of the future may determine it to be profitable, or otherwise, for him to do. Mr. Pomeroy (2 Pomeroy's Eq. Jur. sec. 897,) lays down the proposition that a person who has been defrauded to his injury must, as soon as he

learns the truth, with all reasonable diligence disaffirm the contract; that 'if, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations.' This proposition is approved by our Supreme Court in *Greenwood* v. *Fenn*, 136 Ill. 146, where, also, the rule stated by the Federal Supreme Court in *Grymes* v. *Sanders*, 93 U. S. 55, is repeated, as fol-lows: 'Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent and continue to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract as if the mis-take or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted.' In the same case (*Greenwood* v. *Fenn*) the court quotes approvingly from Littledale, J.: 'No doubt there was at first a gross fraud on the plaintiff, but after he had learned that an imposi-tion had been practiced on him he ought to have made his stand. * * * He gave up his right of objection by dealing with the property after he had once discovered that he had been imposed upon.' So, again, in *Bavarian Brewing Co.* v. *Farrar*, 163 Ill. 471, Mr. Justice WILKIN, in speaking for the court, says: 'It is undoubtedly the law that if a party seeks to rescind a contract on account of fraud he must act promptly, and, upon a refusal of the other party to acquiesce in the rescission, do no act which will amount to treating the contract as valid; as, for instance, a party attempting to declare a rescission of the contract, who afterwards exercises acts of owner-ship over the subject matter of the contract, treating it as his own, will be held to have waived his right to rescind. In order that this effect may be produced, the acquiescence must be with knowledge of the wrongful

acts themselves and their injurious consequences. It must be voluntary—not the result of accident—and it must last for an unreasonable length of time, so that it will be inequitable, even to the wrongdoer, to enforce the peculiar remedies of equity against him after he has been suffered to go unmolested and his conduct apparently acquiesced in.'

"We have in this case, for application of these rules of law, the circumstances that the contract was concluded December 1, 1897, and on that day the appellee entered into possession of the hotel under the lease and the furniture under the bill of sale; that within a short time, during the first week of his possession, appellee discovered the falsity of the entries on the books of the hotel, (also turned over to him by appellant,) whereby the business of the hotel had been inflated and misrepresented to him. Indeed, every fraudulent device and trick that he has ever claimed was practiced upon him in regard to the transaction became known to him early in December. From December 1 until appellant went to Europe, about the 7th or 8th of January, appellant was a roomer in the hotel and ready of access by appellee. On the 3d of January appellee went to appellant's room in the hotel and had a conversation with him. That conversation is so important we reproduce from the abstract the whole of it as testified to by appellee, as follows:

"'After I had fully satisfied myself in regard to these matters I went to the defendant's room. He still had a room in the house. I told him I was dissatisfied; that the receipts were not such as I had been led to expect from what he had told me and from what I had taken from the books, and that I was satisfied false entries had been made in the register and cash book; that he had virtually obtained my money under false pretenses. He said it was untrue, and got very excited and called me a liar. I returned the compliment. He says, 'If there are any false entries I don't know it.' I told him that would hardly

go. He said, 'What do you want?' 'Well,' I says, 'the rent ought to be cut down at least $200 a month for the term. It isn't worth more than that, and there ought to be considerable done in repairs.' He said, 'I won't do it,' but said: 'If I had known you were dissatisfied before I made my arrangements to go to Europe I would have taken the house back. I will anyway, if you will. I expect to be here about the 7th of June, and I will take it back then, when I come back.' I told him that would be satisfactory. He declined to make any repairs, but agreed to pay for some electric lights, and afterwards did. That was the result and extent of my conversation with defendant. Nothing was said as to the terms on which he would take it off my hands in June. He just said he would take it off my hands.'

"His testimony, upon cross-examination, was substantially the same upon the subject of the interview, as follows: 'Dr. Brown had kept a room at the hotel right along as guest up to the 3d day of January, when I had a conversation with him. I said something to him about the fact that he had defrauded me and I told him how I learned it; told him that I had learned that from Granger the first week I was there. I was never in Dr. Brown's room more than once. I told him I was dissatisfied with the showing that the books had made; that the showing was not as good as what he told me and what the cash books show,—that I had been led to expect from what they showed me. I don't know whether I told him what the receipts were or not. Yes, I told him, because he said not more than that.

"Q. 'He merely said if he had known you were dissatisfied before he had determined to go abroad he would have taken the hotel off your hands? Is that right?

"A. 'That is right.

"Q. 'You didn't ask him to take the hotel then, did you?

"A. 'No.

"By the court: 'And he said at that time he would do it when he came back from Europe?

"A. 'He did; yes, sir. He said: 'If I had known you were dissatisfied before I made arrangements to go to Europe I would have taken it (the hotel) off your hands. I expect to be back about June 7, and will take it then.

"Q. 'He didn't say on what terms?

"A. 'Nothing about that.

"Q. 'Nothing said about that?

"A. 'No, sir.

"Q. 'Nothing put in writing?

"A. 'No.

"The court: 'That was all that was said about it?

"A. 'Yes, sir.

"Q. 'Didn't you ask him whether he would pay you back the money at that time?

"A. 'I did not. That is everything he told me at that time, as near as I can remember.

"Q. 'Is that the only time that you ever talked to Dr. Brown prior to the first of August, 1898, about being dissatisfied with the hotel or your purchase?

"A. 'I think it is; yes, sir.

"The court: 'Before the doctor went away?

"A. 'No. I don't think the doctor was there more than a week after that. I didn't see him after that. Dr. Brown left town the 7th or 8th of January.'

"The next occurrence of moment between the parties was a letter dated June 22, 1898, signed by appellee and addressed to appellant at Paris, France, which was in substance as follows: 'You have not returned to the United States this month, as you stated to me you would, and I understand you have not fixed upon any time for your return. I beg to say to you that by reason of the misrepresentations and fraud on your part, by which I was induced to deal with you and purchase your furniture and take a lease of your Grand Central Hotel, and to execute and deliver to you a chattel mortgage of said

furniture and pay you $3000 and take possession and carry on said hotel and hotel business, I have elected to rescind, and have rescinded and do rescind, the said transaction and deal made on or about December 1, 1897, between yourself and me, including the purchase by me of said hotel furniture, and the bill of sale and the leasing and lease of same date, and I hereby offer to place you in all respects, so far as I am able, *in statu quo*, and demand that 'you re-pay' to me the amount I paid to you and deliver up the lease and chattel mortgage to be canceled; and I further demand that you make good and pay to me the amount of damage I have suffered, and for which you are liable to me by reason of such fraud and fraudulent representations on your part.'

"A copy of this letter was also delivered to the agent and counsel of appellant in Chicago, and, later on, negotiations between the counsel for the respective parties were had and continued until appellant's return in September, but finally ended without success. Thereupon, on September 21, a tender was made to appellant of the keys of the house and of a delivery back of the furniture, and a demand for damages made, and the bill was filed on that day. Subsequently the chattel mortgage on the furniture was foreclosed for default by appellee in the payment of rent, and appellee gave possession, at the same time delivering to appellant a notice that in doing so he did not waive, but insisted upon, his right to rescind the deal on account of the deceit of appellant. Appellee paid the rent at the rate of $250 a month, as provided by the lease, from December 1, 1897, until May 1, 1898, and it does not appear that at the time of paying any of such installments, either to appellant or to his agent, appellee mentioned anything concerning a rescission by him of the lease.

"It appears in the evidence, and does not seem to be denied, that on January 24 appellee contracted with the publishers of the Chicago City Directory for 1898 to in-

sert his card in the directory as proprietor of the hotel, in capital letters, under the heading of 'Hotels.' * * * It also appears, and is not disputed, that on or about the first of June, 1898, appellee went to the office of a hotel broker and requested him to sell the hotel furniture at the price of $4000, and stated to him, at the time, the terms of the lease, etc. It further appears that as part of the general agreement made by the parties on December 1, 1897, the appellant agreed to give to appellee an option, to be exercised on or before March 1, 1898, to lease the saloon or buffet adjoining the hotel for a term of two years from May 1, 1898, at $150 a month, and that such agreement was reduced to writing and delivered the next day, after the bill of sale and lease of the hotel were delivered, and that in pursuance of such option the appellee, on March 1, 1898, exercised such option and took the saloon and subsequently occupied it. It appears affirmatively from the testimony of the appellee that the only offers he ever made to rescind the contract entered into on December 1 were those contained in the letter of June 22, 1898, and at the interview on September 21, 1898, when the keys of the hotel were tendered back and the demand made for a return of the money paid.

"The conduct of appellee, as set forth, subsequent to full knowledge by him of all the deceit that he claims was perpetrated upon him, was, it seems to us, absolutely incompatible with the rules of law adverted to in the early part of this opinion. It is not until about June 22, 1898,—more than six months after the discovery of the fraud,—that we can see, in either word or act by appellee, any purpose by him to disaffirm the contract. In the meantime he had done numerous things, stated above, evidencing acts of ownership over the subject matter of the contract. There is scarcely anything more he could have done in the way of treating the property as his own, unless it might have been by executing a sale and delivery of it to a third party, as it is plain he would have

done if a profitable opportunity to do so had occurred. For about a month after he says he knew of the fraud he stood silent, although during all of that time the party who had defrauded him was living with him in the same hotel that was the subject of the transaction between them. In the interview that then occurred, although it was full of anger and recrimination, not a word was said indicative of any intention or desire by him, except by way of diminution of rent as a redress for the damages he had sustained. At that time either course was open to him: to insist upon the fraud and disaffirm the contract, or to waive the fraud and obtain a remedy in damages. The latter course is the only one that seems to have occupied his mind and intention. If he did not then know the full extent of his legal rights in such regard, his lack of knowledge of the law furnishes no excuse.

"But it is said he was lulled into security by the false promise of appellant to take back the property upon his return from Europe in June. If it be assented to that appellant did so promise, the promise could be properly considered only as applying to the subject being talked about—a rectification by a lessening of the rent as a remedy for his damages. At the very most, the promise of appellant to take back the hotel in June was to take it back upon terms then to be agreed upon.

"It would be most unwholesome doctrine, fraught with mischievous and far-reaching consequences, to sustain a decree of rescission under the facts of this record. The order will be that the decree of the superior court be reversed, with directions to that court to dismiss the bill for want of equity, at the costs of appellee."

We concur in the foregoing views of the Appellate Court and in the conclusion reached by that court. Accordingly, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*