### C. D. MINTER v. W. E. HAWKINS ET AL.

Decided February 27, 1909.

**1.—Contract—Fraud—Rescission—Ratification.**

One who seeks to rescind a contract on the ground of fraud must act promptly in disaffirming the contract. If after discovering the fraud he ratifies it or affirmatively acquiesces in it by distinctly treating the contract as of continuing force, claiming its benefits, he cannot thereafter repudiate it.

**2.—Same.**

Where one who has been defrauded in a contract elects to affirm same and to resort to his remedy for damages, the equitable remedy by rescission will be thereby lost. The complaining party will not be allowed to delay and speculate upon the chances of the situation.

**3.—Ratification—Evidence.**

In an action to rescind a contract for exchange of certain town lots for shares of stock in a mercantile company, evidence considered, and held sufficient to warrant the trial court in instructing a verdict for the defendant, on the ground that the plaintiff had failed to act promptly after discovering the alleged fraud and had in effect ratified the contract.

Appeal from the District Court of Tarrant County. Tried below before Hon. Irby Dunklin.

*Smith & Lattimore,* for appellant.—The law does not undertake to say that certain facts shall constitute a waiver or an acceptance, same being for the jury. Hayden v. Houghton, 24 S. W., 803; American Cotton Co. v. Collier, 69 S. W., 1021.

Whether acquiescence or tacit adoption after notice of fraud is ratification or waiver is question for jury. Evans v. Coggan & Bros., 5 Texas Civ. App., 129.

What constitutes a prompt tender and reasonable time and waiver are questions for the jury. Crutcher v. Schick, 10 Texas Civ. App., 680.

Not necessary to make tender before suit, and offer to restore in petition is sufficient if under circumstances suit does not come too late, which is question for jury.

Jury have right to consider whether ordinary prudence required the retention or possession of property and the doing the best he could with it, and acceptance and use thereof after discovery of fraud would not justify court in taking case from jury. Temple National Bank v. Warner, 44 S. W., 1025.

*W. P. McLean* and *W. Erskine Williams,* for appellees.—A party seeking to rescind a contract for fraud must act with promptness and disaffirm it within a reasonable time after discovering the fraud, and if after such discovery he does anything to carry the contract into effect or to obtain or claim its benefits, he can not thereafter repudiate it. Wells v. Houston, 23 Texas Civ. App., 629; Temple National Bank v. Warner, 31 S. W., 653; Adams v. Pardue, 36 S. W., 1015; Emma Silver Mining Co. v. Emma Silver Mining Co. of New York, 7 Fed., 401; 2 Pomeroy's Equity Jurisprudence, 3d ed., secs. 816, 817, 917, 964; 6 Pomeroy's Equitable Remedies, 3d ed. of Pomeroy's Equity, secs. 687, 688.

CONNER, CHIEF JUSTICE.—This case is thus stated in one of the briefs of the parties to this appeal, viz.: "Appellant brought this action against appellee, W. E. Hawkins, and also against W. J. Boaz. He dismissed as to W. J. Boaz before the beginning of the trial in the court below. His action was based upon a contract dated August 28, 1905, by which appellant sold to appellee Hawkins certain lots in the city of Fort Worth for the consideration of fifty shares of the capital stock in the Panther City Hardware Company, a mercantile concern located in the city of Fort Worth.

"Appellant prayed for a cancellation of the deed of conveyance executed by him to Hawkins to said land and for the recovery of the land or its value. He also sued to recover $2900, which he alleged he put into said mercantile concern after he bought it and had taken possession thereof.

"He alleged in his amended petition (the file mark upon which shows that it was filed on the 8th day of January, 1908, the judgment having been rendered on the 2d of December, 1907, and the motion for a new trial having been filed December 14, 1907), that Hawkins misrepresented to him the amount of goods on hand, the amount of the indebtedness of said Panther City Hardware Company, and the amount due to said company, and by such false representations induced him to buy the shares of stock and give therefor the land described in his petition.

"He also prayed for judgment for $2900, which he alleged he had expended in adding to said stock of goods after he bought it.

"Appellee Hawkins pleaded a general denial and also specially answered that appellant had every opportunity to examine said stock

of goods and ascertain its value and the amount and value of its
notes and accounts, as well as the amount of the outstanding in-
debtedness against said company. That he, appellee, had not been
engaged in said business for more than a year before the sale to ap-
pellant; but had been engaged in other business not connected with
said hardware company, and was ignorant of the real condition of
the company and its business at the time of said sale. He answered
that said company was solvent at the time of said transaction, and
that if it had become insolvent thereafter said insolvency resulted
from the mismanagement and conduct of the business by appellant.

"After all of the testimony had been introduced the court, after
hearing the argument, decided that appellant ought not to recover
upon his action under the testimony. That his conduct showed a
complete ratification of the contract and that the case which he had
made by the testimony was one upon which no equitable decree could
be rendered by the court adjusting the rights of the parties, even
if a rescission of the contract were decreed. He therefore instructed
the jury to find for the appellee Hawkins." And judgment in favor
of appellee Hawkins was accordingly entered and appellant has ap-
pealed.

The evidence on the issues of the alleged false representations; of
the insolvency of the Panther City Hardware Company; and of the
worthlessness of the stock for which appellant traded, is undoubtedly
such as to require the submission of such issues to the jury. The
controlling question before us is whether the evidence of appellant's
ratification or acquiescence in the transaction after his discovery of
the alleged fraud is of that conclusive character which justified the
court in taking that issue away from the jury and in giving the
peremptory instruction stated. Appellant's evidence relating to this
issue is as follows:

"I found out that the concern was not able to pay its debts, or not
possessed of assets sufficient to pay its debts. I made that discovery
about the first of January. When I made that discovery I reported
it to the creditors of the concern and I then offered to turn them
over the stock of groceries and hardware and everything in settlement
of the debts. I don't think that proposition was made in writing. I
made a statement of the assets and liabilities, and sent to all the
creditors. That was in writing, in the shape of a letter. . . .
From the time I went in there up to the time of the bankruptcy
we bought goods to replenish the stock, and paid old bills with the
money. I watched that matter very close and there was not one
cent of money taken out of that business from the time I bought in
there until this petition in bankruptcy was filed, other than salaries
of the men that were in there. We sold goods right along and bought
others . . . I have been in dry goods and general merchandise
business all my life ever since I was 11 years old. At the time of
the trade I was not engaged in merchandise but I was an experienced
merchant. At that particular time I was engaged in real estate and
merchandise together, brokerage. . . . We made some cash pur-
chases all the way through after the first of January; we bought all
the stuff we needed along, to replenish and keep up the sales. We

turned the stock over, virtually turned the stock over to the creditors; it was in their hands and then we invoiced it, and we bought, while we were selling goods we bought goods along as we would get out of things; we would buy a few and buy for cash and sold them, to keep the stock up. Q. Did you ever go to Mr. Hawkins and ask him to take back those goods and give you up your land? A. Mr. Lattimore I think made that demand for me. The first of January I turned it over to Mr. Lattimore. I didn't have authority to offer him the goods. I offered him the stock. The stock controls the goods. . . . Witness was asked: 'You never tendered Mr. Hawkins anything after you became dissatisfied with this trade, whenever that was, except the stock, and did you ever tender him the stock?' Witness answered: 'Yes, sir; only through my attorney. Messrs. Smith & Lattimore were my attorneys; they were already employed generally for probably three or four months back of that to attend to any business that I had; my attorneys individually and for the Panther City Hardware Company also. I didn't go to Mr. Hawkins because I couldn't find him. He lives in Fort Worth, and lived in Fort Worth then, and I was living here at that time. I couldn't find him. That was not the reason I didn't go—because my attorneys were attending to this matter, the effect of these misrepresentations. I had employed them to bring suit if necessary. I never personally tendered anything to Mr. Hawkins before I brought this suit. . . . Q. When did you begin to notice about these debts that had not been reported to you against the company? A. There were some of them reported in October, some right along, kept coming all along; until after the bankruptcy proceeding they came in; we got duns from parties. I think I was elected president of the company; Mr. Glass was vice-president and Mr. Burns was secretary and treasurer. I began to hear about these debts that had not been reported to me, along in October and November, and all along through. I said something to Mr. Hawkins about it the first time I saw him; I don't remember the exact time, and I think I did to Mr. Boaz, too. I am certain I mentioned it to Mr. Hawkins; I don't know when exactly. I told him that the thing looked mighty bad; it was not represented right. I would ask him about things; he would refer me to Mr. Wyatt, said straighten it out, until we got to invoice I didn't suppose it would be one-fourth as bad as it was until we invoiced. I knew about these debts; I knew all about the debts. Q. But you didn't know how much goods there were until the invoice? A. I didn't know how much debts there was, either, that was overplus until we checked up the books and invoices. I knew there were some debts that had not been reported to me, in October and November. Some of them came in afterwards; some of them came in quite a while afterwards. . . . We took the invoice the first of January; I think we started in December. We took the invoice and after we found out the condition of affairs we told Mr. Glass about it. He wanted to take a gun, waved around with his knife and was going to kill Mr. Hawkins and Mr. Wyatt. I had quite a time in there. I figured out the best I could and reported it to the creditors and proposed to make a settlement afterwards; proposed to turn over

the goods or try to pay it out at sixty cents on the dollar, fifty cents cash or sixty cents notes. After we took this inventory in January and discovered the true status of affairs, that is the first time we figured up the aggregate of the debts and the amount of the stock and found out whether there was as much as had been represented to me, on hand. Q. After that did you see Mr. Hawkins? A. I couldn't find Mr. Hawkins. I had no opportunity to tender back to Mr. Hawkins his stock at any time before this was put in the hands of the bankruptcy court. I think he was away from here, to Beaumont or some place, at that time. I made a trip around; went to Chicago and St. Louis, to see Philips-Butdorf, Belknap Hardware Co. and all those people, in an effort to try to save out of this something of what had been put in. Over and above this stock that I bought from Mr. Hawkins I had put into the business the $2,000 grocery stock and about $1900 in money, that I had loaned it. I heard Mr. Glass testify that I bought his stock and gave him $100 for it; and that is correct. I lost that $100. . . . I don't remember the exact date of the bankruptcy proceeding. It was in January or February; I think it was in February. In January we turned that stock over to the creditors to invoice and pay their debts and after that somebody else put it in bankruptcy. I don't know who did that turning over to them; Mr. Burns and myself, I guess, the officers of the company, Mr. Glass. I think Mr. Glass had something to do with it. It was by his sanction. Q. You and Mr. Burns were the active members in it; wasn't you the leading? A. I was president; yes, when I found out it wouldn't pay out I wanted to save the creditors all I could."

There was other evidence showing that soon after appellant went into the business one or more of the managers or bookkeepers discovered that some of the stock of hardware was old; that empty boxes were found on the shelves; that the concern was overdrawn at the bank; that unlisted debts were being presented; and that no tender or demand for rescission was in fact made of Hawkins until this suit was filed.

The law is that the party who seeks to rescind a contract for fraud must act promptly in disaffirming the contract. If after the discovery of the fraud he ratifies it or affirmatively acquiesces in it by distinctly treating the contract as of continuing force, claiming its benefits, he can not thereafter repudiate it.

We think it unnecessary to discuss the facts at length. Our conclusion thereon is that the evidence in its most favorable aspect to appellant conclusively shows that after discovery of the fraud, if any, appellant consciously dealt with the property acquired as his own, and treated the contract as a continuing one, and that he hence lost his right of rescission, if any ever existed. The value of the lots given for the stock is not shown, nor is insolvency on the part of Hawkins proven so as to exclude the inference that at the time of appellant's discovery of the alleged fraud the lots were of small actual value, and that appellant hence deliberately chose to affirm the contract and resort to his remedy for damages as more satisfactory at the time. If so, the equitable remedy of rescission was no longer

available so as to enable appellant, nearly three months thereafter, to recover the specific lots after they may have been augmented in value far in excess of appellant's actual damage. We make this suggestion to illustrate one of the reasons of the rule in equity that one who wishes to rescind a contract for fraud must act promptly. He is not permitted to speculate upon the chances of the situation. See Wells v. Houston, 23 Texas Civ. App., 653; Temple Nat. Bank v. Warner, 31 S. W., 239; Adams v. Pardue, 36 S. W., 1015; Emma Silver Mining Co. v. Emma Silver Mining Co. of New York, 7 Fed. Rep., 401; 2 Pomeroy's Equity Jurisprudence, 3d ed., secs. 816, 817, 917, 964; Pomeroy's Equitable Remedies, 3d ed. of Pomeroy's Equity, secs. 687, 688.

It is accordingly ordered that the judgment be affirmed.

### ON MOTION FOR REHEARING.

We disposed of this case on original hearing upon the theory that the only issue presented and acted on by the trial court was one of rescission. It is now suggested, however, that plaintiff alleged and offered to prove the value of the lots given by him to appellee W. E. Hawkins for the alleged worthless stock in the Panther City Hardware Company and sought to recover damages. The record shows that the trial was had and judgment entered upon December 2, 1907; that appellant's amended motion for a new trial was filed December 14, 1907, and the only pleading that we have been able to find purporting to set up the issue of damages in the alternative is one styled, "Plaintiff's Amended Original Petition, Filed January 8, 1908"— more than a month after the judgment. And while it is true that it appears by bill of exception that upon the trial appellant offered to prove by himself the market value of the lots involved in this controversy, it further appears that objection was made thereto and sustained by the court on the ground that there was no allegation in the petition showing what their value was. No assignment of error has been presented urging the exclusion of this evidence as error, nor did appellant request the submission of the issue of damages. In view of all which we conclude that we correctly assumed, as indeed was orally stated on the submission as we recollect it, that the only question presented was the alleged right of appellant to a rescission. As to this phase of the case we find no reason to alter the conclusions originally announced, and the motion for new trial will therefore be overruled.

*Affirmed.*

Writ of error refused.