ARTEBURN v. PRICE.

(Court of Civil Appeals of Texas. Amarillo. Dec. 14, 1912.)

VENDOR AND PURCHASER (§ 114*)—FRAUD—RATIFICATION — NOTICE — ACTS OF OWNERSHIP—LEASING LAND AFTER ACTION COMMENCED.

The act of a purchaser in leasing the land after becoming aware of fraud practiced on him by the vendor and after suit was brought for the purchase price was such an act and assertion of ownership as to bar his right to rescind, since, if he desired to rescind, it was his duty to act promptly upon learning of the fraud, and, if he thereafter recognizes the contract as still subsisting or continues to treat the property as his own, he will be held to have ratified the transaction, and is estopped from subsequently demanding a rescission.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 202–204; Dec. Dig. § 114.*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by J. F. Price against W. Arteburn. Judgment for plaintiff, and defendant appeals. Affirmed.

J. A. Stanford and R. R. Hazelwood, both of Amarillo, for appellant. Reeder & Dooley, of Amarillo, for appellee.

PRESLER, J. Appellee brought this suit upon vendor's lien notes, aggregating approximately $20,000, said notes having been given for part of the purchase money of survey No. 37, in block 2, A. B. & M., Potter county, Tex.; a vendor's lien having been retained to secure the payment of the said notes. Appellant in his answer admitted the purchase of the land, and the execution of the notes sued on; also alleged that he had paid $2,000 cash at the time of said purchase, and by cross-action set up that he had been induced to purchase said land by false representations of appellee's agent, one Sanger, as to the quality, productiveness, and value of the land; that he relied upon said representations, which were false, and was deceived thereby into buying the land in question, and prayed that he have rescission of said contract of sale, tendered a reconveyance of the land to appellee, and prayed that he recover the $2,000 purchase money which he had paid, and offering in his pleading to make a deduction therefrom of the sum of $750 for the rent and use of the place during the years 1909, 1910, and 1911. Appellee, by supplemental petition, answered to said cross-bill, to the effect that the land was worth the consideration the appellant contracted to pay; that upon the completion of the contract of sale appellee delivered possession thereof to appellant; that appellant in the fall of 1908 went into possession of said section of land as his own, and occupied the same continuously during the years 1909 and 1910, and that appellant leased said land for the year 1911, and further stated upon information and belief that appellant had leased said section for 1912; that appellant had ample opportunity during the fall of 1908 and the early spring of 1909, while he resided upon said land and used the same as his home and property, to ascertain both as to the number of acres covered by a lake on said section complained of by appellant, as well as the real value of the land, and that appellant did learn and know both of these items early in the spring of 1909, and that the land was well worth the price appellant agreed to pay therefor, and that the number of acres, if any, covered by the lake, was not only not damaging,

but very beneficial to said land, and that appellant knew these facts, and, if the facts were not true, appellant learned that they were not early in the spring of 1909, and also learned that said land had not and would not produce such crops as the said C. W. Sanger is alleged to have represented, and that it was appellant's duty in equity and good conscience to then and there notify appellee of his contention and intention, if any he had, not to live up to his executory contract, and, having failed to do so, appellant had estopped himself from all claim and right to rescind his contract, and by said acts of ownership and domination and control he had misled appellee into favoring him and permitting him to remain in possession of the premises, and to get the fruits and revenues from the land for the years 1909, 1910; and 1911, and further answered that appellant had fully ratified and confirmed said contract of sale between himself and appellee by his acts and conduct in remaining in possession of said premises, using and enjoying the same, and exercising dominion and ownership thereover and by appropriating the fruits and revenues from said property during the years 1910 and 1911, to his own use and benefit, and this after a time and date on which he admitted he learned and ascertained that the representations made to him by the said Sanger were false, and thereby estopped himself from claiming a rescission of said contract; that the fruits, rents, and revenues of the land for the years 1909, 1910, and 1911 had been appropriated by appellant to his own use, and were reasonably and well worth $2,500; that appellant did not offer to account to appellee for the same, and, failing to do so, has not put himself in the proper attitude to ask for equitable relief.

The cause was tried before the court with the assistance of a jury, who, under instruction of the court to that effect, returned a verdict for appellee, on which judgment was entered for the amount of said notes foreclosing the lien on the land and finding against appellant on his cross-bill, from which judgment appellant duly appeals to this court, and asks that said judgment be reversed and remanded on the ground that the court erred in the peremptory instruction given to the jury to find for appellee, insisting that the evidence offered in support of appellant's cross-bill is such as to at least make a question of fact as to whether or not appellant was entitled to have a rescission, and that the court should have submitted such question for the determination of the jury.

Upon an examination of the record we find the evidence material to this question to consist largely of appellant's own testimony, who testified in part substantially as follows: "I moved out on the land a day or two of the first days of the year 1909, I commenced learning of the misrepresentations Sanger had made about the land right away after moving on it. I think I had been there on it something like a month or maybe a little over before I knew about the lake. * * * I never learned that there were only about 150 acres in cultivation until late in the fall of 1909. Along that fall I thought they were pretty short acres, and went out and measured it. I measured the row crop the first winter I was there, and there was a little bit over 30 acres in it only. I learned after we got out in the neighborhood that the land was worth from $15 to $17 an acre. After I learned that Sanger had overreached me, I came to Price along in the spring, and spoke to him about Sanger misrepresenting things. * * * I said, 'It looks to me like he ought to be prosecuted, a man that will misrepresent things to people like that;' and Mr. Price allowed that there would not be much in going to law. He told me that I could not get much out of it, and I just let it go. I did not say anything right then about taking the land back and getting my money back, I let that go until Price was moving away. * * * The reason I went to Price the next spring [referring to 1909] was to lay in a complaint about how things had been misrepresented to me. I told him how Sanger had misrepresented things to me, and remarked about what his commission was. I told him Sanger had said he had to cut his commission in two to make the deal, and Price said Sanger was telling a lie about that. I said that the way he had misrepresented things he ought to be prosecuted. I knew right then how many acres were in the row crop, and knew about the lake being there. * * * I said something to Mr. Price to the effect that Sanger ought to be prosecuted, and Price said it would not amount to anything. I did not then offer to give up the land. I did not know what I wanted to do. I stayed on another year until those notes came due in October. There was a note due when I went to Price in the spring, and when I laid in the complaint first there was a note due. I went to him, and told him I would not be able to meet these notes. He did not make much remark about it. I referred then to Sanger misrepresenting things. I said that Sanger had misrepresented several things in this deal. * * * I just asked Price what to do about it. I could not pay the note, I did not ask him to extend it. * * * There wasn't much talk about extending that note. I just told him I couldn't pay it. * * * I went to him, and talked to him again in the fall. I had made up my mind there was no use to go further with the land in that shape. I seen I could not meet these payments, and I didn't know anything about the law part of it and these misrepresenta-

tions, and I. went for advice. * * * I went to him, and laid in my complaint, and asked him what to do. I thought I ought to go on to Sanger. * * * I never offered to redeed the land to Price. I didn't ask for an extension on the notes. He told me to stay with the land. He said he did not want me to lose a dollar. He told me, if I would stay with the land, I would never on his account lose anything. * * * I did not tell him I would not keep the land. He just told me to stay with the land, and that that was the thing for me to do. At that time I had found out the representations of Sanger—the fraudulent ones, except the body of the land. I had not measured the body of the land when Price left. I had had plenty of opportunity to have done that. I measured the plowed ground some time that winter. I did stay on the premises, and occupied them, and made a crop. I farmed there two summers and used it just like it was mine. I did not bother Price to take this land back. * * * Mr. Price did not in 1909 ever tender me back my notes and offer to take the land. He did offer to do that in October, 1910. I sure refused to give him back the land then for the notes I had signed. * * * I found out before 1910 that the lake was there. I think it was the fall of 1909 that I found the number of acres in cultivation. I knew all those things in October, 1910, and, while Price offered to rescind, I did not want to do that and did not. I did not offer to make any proposition by giving him the land back for my notes. * * * I thought he ought to sue Sanger for damages. I did not know just how the proceedings ought to be had. I kept the land all along just the same. I cannot say it was my object at all to have Price take the land and give up my notes. * * * I leased the place to Chas. Kilgore for the year 1911, and put him in possession. I did that after this suit was filed. I think that was after I had been served with process. I got a note from Kilgore for $250. I transferred that to the First State Bank. I refused to pay the taxes for 1910. I do not think it is true that, after this suit was filed, Mr. Price still made me a proposition to take a deed from me and release me from my obligations and pay the costs and pay the taxes. I think you wanted $250 for yourself (Mr. Reeder). You (Mr. Reeder) made me the only proposition that was made to settle the suit. You wanted me to pay the taxes and give you $250 and give Price a deed. After that I made a contract with Mr. Kilgore. * * * I have not leased that land to any one this year, I have tried to. I have contracted with a man to let him have it for the year 1912."

From the entire evidence in the case we find that appellant made no effort to rescind the contract of sale prior to filing his crossbill in this case, and it is also evident that he kept and used the land for a long time after he became aware of the alleged fraud. The evidence showing that, as stated by him, he first went to appellee in the spring of 1909, when there was an unpaid note due and complained to appellee of the misrepresentations made by his agent Sanger in inducing appellant to buy the land, but no statement made by him at that time can be construed, either as an effort or a desire on his part, to have a recission of the contract, and that at this time he knew and had had opportunity to know the truth as to the fraudulent representations claimed to have been made by the said Sanger. The evidence further shows that appellant went to appellee again in the fall of 1909, when there were payments due and unpaid, and again complained of the misrepresentations of the said Sanger, and that upon this occasion, he having gone to appellee for advice, appellee advised him to stay with the land, and that he would not lose anything on account of appellee. On this occasion the appellant testified that at that time he owed appellee altogether about $4,250, and he told appellee that he could not meet these notes; that he complained of the misrepresentations as to the land made by Sanger, and asked appellee what to do; that on this occasion he never offered to reconvey the land to appellee; that appellee told him to stay with the land, said he did not want him to lose a dollar, and told him, if he would stay with the land, he would never on his account lose anything, and at this time it is apparent from the evidence that he was informed as to the falsity of the representations of which he complains. He did not make an offer to reconvey the land or any effort to have a rescission of the contract of sale. Appellant seeks to excuse his delay in asking for a rescission and continuing to retain possession and control of the land, appropriating its use and benefits to himself, because of the advice given him on this occasion by appellee; but we are of the opinion that, giving to the statement of appellee its greatest possible effect under the law, it did not preserve to appellant the right to rescind thereafter, and that, if appellant in fact decided to act in accordance with said advice, such action of itself showed an intention to stand by the contract and depend on appellant to make good any damages or deficiencies accruing to appellee because of the misrepresentations complained of, and, even if it be considered that the relations between the parties were such that appellant had the legal right to go to appellee for advice as to what action he should take with reference to his rights in the matter and to rely on such advice, this would in our opinion avail appellant nothing upon the facts of this case, for the evidence shows that appellant retained said property and continued to exercise dominion and ownership over the same after he knew that he could expect no concessions or indemnity

from appellee, appellant admitting that he leased the property for 1911 for $250, and this after the present suit had been filed against him, and he had been served with process herein, and that he had contracted to lease the property for the year 1912 during the pendency of this suit, and it can hardly be contended that appellant at that time was still relying on appellee to see that he did not lose anything on his account after appellee had instituted this suit against him on the outstanding notes. We are of the opinion that the leasing of the property by appellant occurring after he became aware of the alleged fraud and after he knew of this suit was such an act and assertion of ownership as constitutes a bar to his right to rescind in this suit. The law being well settled in all jurisdictions in this country that a person who has been induced to purchase property by material fraudulent representations, upon the discovery of the fraud, has the option of declaring a rescission or abiding by the contract and seeking reparation by way of damages, but, if he desires to rescind, it is his duty to act promptly upon learning of the fraud, and, if he thereafter recognizes the contract as still subsisting or continues to treat the property as his own, he will be held to have ratified the transaction, and will be estopped from subsequently demanding a rescission. Koppe v. Koppe, 57 Tex. Civ. App. 204, 122 S. W. 68; Minter v. Hawkins, 54 Tex. Civ. App. 228, 117 S. W. 172; Richardson v. Lowe, 149 Fed. 625, 79 C. C. A. 317; Mestler v. Jeffries, 145 Mich. 598, 108 N. W. 994; Follett v. Brown, 188 Ill. 244, 58 N. E. 943; Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419; Precious Blood Soc. v. Elsythe, 102 Tenn. 40, 50 S. W. 759; Provident Loan Trust Co. v. McIntosh, 68 Kan. 452, 75 Pac. 498, 1 Ann. Cas. 906; Faulkner v. Wassmer, 77 N. J. Eq. 537, 77 Atl. 341, 30 L. R. A. (N. S.) 872, and note.

We therefore conclude that upon the entire evidence in this case the court did not err in giving a peremptory instruction to the jury to find for appellee, and that the judgment appealed from should be in all things affirmed, and it is so ordered.